Renee M. Finch, Esq.
Nevada State Bar 13118
**MESSNER REEVES LLP**
8945 W. Russell Road, Suite 300
Las Vegas, Nevada 89148
Phone:        (702) 363-5100
Email:        *rfinch@messner.com*
*Attorneys for Plaintiff*, Treasure Island, LLC

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TREASURE ISLAND, LLC, | CASE NO. |
|     *Plaintiff*, | |
| v. | |
| AFFILIATED FM INSURANCE COMPANY, | |
|     *Defendant*. | |

## COMPLAINT

Plaintiff, Treasure Island, LLC ("Treasure Island"), files this Complaint for damages and declaratory judgment against Defendant, Affiliated FM Insurance Company ("AFM"), alleging the following:

### I.        INTRODUCTION

1.        This diversity action for bad faith breach of contract and declaratory judgment arises out of Treasure Island's claim of insurance coverage under an "all risks" insurance policy sold by AFM to Treasure Island.

2.        Despite agreeing to cover Treasure Island for all risks of physical loss or damage to property unless specifically excluded in the policy, and Treasure Island's resulting business interruption loss, AFM refuses to show its hand and, instead, has doubled down on a calculated claims handling strategy designed to limit or altogether deny Treasure Island from the recovery it is entitled to receive under an insurance contract it has long-relied on as protection against unforeseen loss or

damage and resulting loss of income.  Undeniably, AFM chose to insure against loss caused by communicable disease, both at and away from Treasure Island's property. AFM should be required to play its hand and cover Treasure Island's losses.

## II.     THE PARTIES

3.      Treasure Island is a limited liability company organized under the laws of the State of Nevada, with its principal place of business at 3300 Las Vegas Boulevard South, Las Vegas, NV, 89106. No member of Treasure Island is a resident or domiciliary of Rhode Island.

4.      AFM is incorporated under the laws of Rhode Island with a principal place of business at 270 Central Avenue, Johnston, RI 02919.

5.      AFM is authorized to do business and issue insurance policies in the State of Nevada.

## III.     JURISDICTION & VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000, exclusive of interests and costs.

7.      Venue is proper in this District under 28 U.S.C. § 1391 because Treasure Island's principal place of business is in this District and a substantial portion of the events and omissions giving rise to the claims and losses occurred within the District.

## IV.     FACTUAL BACKGROUND

8.      Treasure Island is a sprawling 2.1 million square foot casino and resort occupying over 20 acres of land. It has over 2,000 gaming attractions, nearly 3,000 rooms, and employs approximately 2,000 people.  The number of guests that Treasure Island welcomes onto its property is staggering—over 7,000 people on an average day.

9.      AFM is an insurance company that sold an insurance policy to Treasure Island providing coverage to Treasure Island against "all risks of physical loss or damage, except as … excluded."  (See Policy No. GS784, attached as Exhibit A (the "Policy").)

10.     The Policy has an effective term of March 20, 2019 through March 20, 2020.

11.     The Policy also affords coverage to Treasure Island for business interruption losses occurring as a result of physical loss or damage of the type insured under the Policy.  Exhibit A, at TIPOLICY034.

12.     The Policy provides up to $850 million in coverage for property damage and up to $327 million in coverage for business interruption losses.  Exhibit A, at TIPOLICY062.

13.     The Policy provides Civil Authority coverage for business interruption loss resulting from the prohibition of access to covered property for up to 395 days.  Exhibit A, at TIPOLICY039; TIPOLICY006; TIPOLICY062.

14.     In exchange for AFM's agreement to take on Treasure Island's risk of loss, Treasure Island paid AFM nearly $1 million in premium.

**A.      COVID-19 is a Deadly Communicable Disease**

15.     COVID-19 is a deadly communicable disease that has already infected over 1.6 million people in the United States and caused more than 100,000 deaths.[1]  There is no vaccine for COVID-19.

16.     The World Health Organization ("WHO") has declared the COVID-19 outbreak a pandemic and President Trump has declared a nationwide emergency due to the public health emergency caused by the COVID-19 outbreak in the United States.

17.     The incubation period for COVID-19—the time between exposure (becoming infected) and symptom onset—can be up to 14 days.[2]

18.     During this period (also known as the "pre-symptomatic" period), infected persons can be contagious and disease transmission can occur before the infected person shows any symptoms or has any reason to believe they are infected.[3]

---

[1] See *https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html* (last viewed May 28, 2020, 2020).

[2] See *https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2* (last viewed May 4, 2020).

[3] See *https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2* ("In a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases. This is supported by data suggesting that some people can test positive for COVID-19 from 1-3 days

19.     Not only is COVID-19 spread by human-to-human transfer, but the WHO has confirmed that COVID-19 can exist on contaminated objects or surfaces.[4]

20.     According to a study documented in *The New England Journal of Medicine*, COVID-19 was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel.[5]

21.     All of these materials are used by Treasure Island throughout its facilities and operations.

22.     The study's results suggest that individuals could become infected with COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic or not.[6]

**B.      Civil Authority Orders Because of COVID-19 and Related Physical Loss or Damage to Property**

23.     In an effort to slow the spread of COVID-19 and as a consequence of physical damage caused by COVID-19, federal, state and local governments imposed unprecedented directives prohibiting travel into the United States, requiring certain businesses to close and requiring residents to remain in their homes unless performing "essential" activities, like shopping for food, going to see a doctor, or getting fresh air ("Stay at Home Orders").

24.     The Stay at Home Orders typically require businesses deemed "non-essential" to be closed and in-person work is not permitted.

25.     However, even businesses classified as "essential" have been severely impacted by the pandemic and Stay at Home Orders.

---

before they develop symptoms. Thus, it is possible that people infected with COVID-19 could transmit the virus before significant symptoms develop.") (last viewed May 4, 2020).

[4] See *https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations* ("[T]ransmission of the COVID-19 virus can occur by direct contact with infected people and indirect contact with surfaces in the immediate environment or with objects used on the infected person") (last viewed May 4, 2020).

[5] See *https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces* (last viewed May 4, 2020); see also *https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations* (last viewed May 4, 2020).

[6] Id.

26.     Stay at Home Orders remain in effect as of the date of filing and have caused the suspension of both non-essential and essential businesses.

27.     As a business that relies on materials and customers from right next door to across the country to around the world, Treasure Island is subject to these various Stay at Home Orders.

28.     Stay at Home Orders, the damage caused by COVID-19, and the transmission of COVID-19 have had a devastating effect on Treasure Island's business.

29.     One of the first publicized cases of COVID-19 in Las Vegas was a guest that stayed from March 5th through 8th at the Mirage Resort and Casino, which is located immediately next to Treasure Island and connected to Treasure Island by tram.  This case was publically reported on March 11, 2020.

30.     The next day, March 12, 2020, Nevada Governor Steve Sisolak declared a state of emergency in the state of Nevada citing the presence of COVID-19 and its impact on lives and property.  (See   NV   Exec.   Decl.   of   Emergency,   dated   March   12,   2020, http://gov.nv.gov/News/Emergency_Orders/2020/2020-03-12_-_COVID-19_Declaration_of_Emergency/, attached as Exhibit B).

31.     Five days later, pursuant to his March 12, 2020 Declaration, Governor Sisolak further ordered all gaming activities in the state to close at midnight on March 17, 2020.  (See NV Exec. Emergency      Order,      dated      March      17,      2020, http://gov.nv.gov/uploadedFiles/govnewnvgov/Content/News/Emergency_Orders/2020_attachments/2020-03-17-NV-Health-Reponse-COVID19-Risk-Management-Initiative-2.pdf, attached as Exhibit C).

32.     As a direct result of COVID-19 and these Orders, issued directly because of physical damage to property, Treasure Island closed its doors at 12:01 AM on March 18, 2020.

33.     Persons infected with COVID-19 were present at Treasure Island prior to March 18, 2020.

34.     In fact, during the period January 1, 2020 to March 18, 2020, Treasure Island employees recorded more than 1,500 sick days.  During that same period, Treasure Island had more than 329,000 registered guests from all over the world.

5

35.     On March 20, 2020, Governor Sisolak, again noting the need to protect person and property, ordered all non-essential businesses to close and restricted the activities of essential businesses. (See NV Exec. Emergency Decl., Directive No. 3, dated March 20, 2020, http://gov.nv.gov/News/Emergency_Orders/2020/2020-03-20_-_COVID-19_Declaration_of_Emergency_Directive_003_(Attachments)/;     and     related     regulations, http://gov.nv.gov/uploadedFiles/govnewnvgov/Content/News/Emergency_Orders/2020_attachments/2020-03-20_COVID-19_DPS_DEM_EmergencyRegulations.pdf, attached as Exhibit D).

36.     On April 29, 2020, Governor Sisolak issued a Directive explaining, among other things, the basis for the closure and stay at home orders stating specifically that the ability of COVID-19 "to survive on surfaces for indeterminate periods of time renders some property unusable and contributes to contamination, damage, and property loss …."  (See NV Exec. Emergency Decl. Directive No. 16, dated April 29, 2020, http://gov.nv.gov/News/Emergency_Orders/2020/2020-04-29_-_COVID-19_Declaration_of_Emergency_Directive_016_(Attachments)/, attached as Exhibit E).

### C.     Treasure Island's "All Risks" Policy

37.     The Policy covers property at or within 1,000 feet of Treasure Island's locations "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded …." Exhibit A, at TIPOLICY016.

38.     Treasure Island's insured locations, referred to as "described locations" and "location" throughout the Policy, are: (a) the actual casino located at 3300 Las Vegas Boulevard South, Las Vegas; and (b) an office/warehouse located at 4050 West Sunset Road, Suite B, Las Vegas. These locations are referred to herein as "Treasure Island Locations."   Exhibit A, at TIPOLICY016, TIPOLICY057, & TIPOLICY004.

39.     AFM drafted the Policy.

40.     Pursuant to the "Communicable Disease – Property Damage" coverage, the Policy expressly covers, among other things, "the reasonable and necessary costs incurred … for the: (a)

Cleanup, removal and disposal of … **communicable disease** from insured property." [7]  Exhibit A, at TIPOLICY022.

41.     By providing for the "cleanup, removal and disposal of … **communicable disease**," the Policy explicitly recognizes that **communicable disease** physically damages property.

42.     Accordingly, because the Policy specifically covers remediation of the damage caused by **communicable disease**, the physical damage to property caused by **communicable disease** is "physical damage of the type insured" under the Policy.

### 1.     COVID-19 Triggered Coverage Under the "All Risks" Policy

43.     The actual presence of COVID-19 at Treasure Island Locations has triggered coverage under the Policy.

44.     In addition, the presence of COVID-19 on property away from Treasure Island Locations has triggered coverage under the Policy.

45.     COVID-19 has caused (and continues to cause) physical loss and physical damage to property, including Treasure Island's property.

46.     COVID-19 also has caused (and continues to cause) Treasure Island to experience covered business interruption.

47.     Treasure Island has submitted a claim pursuant to the Policy as a result of sustaining losses covered by the Policy.  Notwithstanding, AFM has denied coverage for Treasure Island's claim and done so in bad faith based on an apparent systematic company practice designed to minimize payments for covered COVID-19 claims.

### 2.     Multiple Coverages are Triggered under the "All Risks" Policy

48.     In addition to triggering the Policy's "all risks" coverage, Treasure Island's claim also triggers multiple coverage "extensions" provided under the Policy including but not limited to the following.

---

[7] Terms defined in the Policy are signified by the use of **bold** typeface. Unless otherwise stated, the use of **bold** typeface signifies the use of same in the Policy.

7

### i.     COVID-19 Triggered the Policy's Communicable Disease – Property Damage Coverage

49.     The actual presence of COVID-19 at the Treasure Island Locations has caused physical damage to property at these locations resulting in the issuance of an order by an authorized governmental agency regulating communicable disease, thereby triggering coverage under the Policy's Communicable Disease – Property Damage coverage.

50.     Upon information and belief the actual presence of COVID-19 continues to exist at Treasure Island Locations.

### ii.     COVID-19 Triggered the Policy's Protection and Preservation of Property – Property Damage Coverage

51.     COVID-19 also has caused and continues to cause actual physical loss and damage to insured property.  In addition, COVID-19 has threatened and continues to threaten to cause physical loss and damage to property.

52.     This actual and threatened physical loss and damage to insured property has prompted Treasure Island to take action to temporarily protect or preserve its property, thereby triggering the Policy's Protection and Preservation of Property – Property Damage coverage.

### iii.     COVID-19 Triggered the Policy's Business Interruption Coverage

53.     The Policy affords coverage for Treasure Island's business interruption losses, subject to the Policy's terms and conditions.

54.     COVID-19 has caused Treasure Island to suffer business interruption loss as a direct result of physical loss and damage of the type insured under the Policy.

55.     This loss triggers coverage under the Policy's Business Interruption provisions including, without limitation, coverage for up to 395 days of Gross Earnings loss, Gross Profits loss and Rental Income loss.

### iv.     COVID-19 Triggered the Policy's Extra Expense Coverage

56.     COVID-19 has caused Treasure Island to incur reasonable and necessary expenses to continue as close to normal as possible the conduct of Treasure Island's business.  Such expenses are beyond those that would have normally been incurred in conducting the business absent the presence of COVID-19.

8

57.     The expenses incurred by Treasure Island beyond those necessary in the normal operation of its business solely as a result of the physical loss and damage caused by COVID-19 trigger coverage under the Policy's Extra Expense coverage.

### v.     COVID-19 Triggered the Policy's Attraction Property Coverage

58.     COVID-19 also has caused and is continuing to cause physical loss and damage to property away from Treasure Island Locations, including property located within one (1) statute mile of Treasure Island Locations.

59.     Treasure Island has sustained and will continue to sustain a loss of business income directly resulting from physical loss and damage of the type insured to property of the type insured that attracts business to the Treasure Island Locations.

### vi.     COVID-19 Triggered the Policy's Civil Authority Coverage

60.     The physical damage caused by the presence of COVID-19 at property located within five (5) statute miles of Treasure Island Locations has directly resulted in the issuance of orders and Directives by Governor Sisolak and other civil authorities prohibiting access to Treasure Island Locations.

61.     Treasure Island has sustained and will continue to sustain business interruption losses because orders from civil authorities issued as a direct result of physical damage of the type insured at a Treasure Island Location or within five (5) statute miles of such a Treasure Island Location, have prohibited access to Treasure Island Locations.

### vii.     COVID-19 Triggered the Policy's Communicable Disease – Business Interruption Coverage

62.     The actual presence of COVID-19 at Treasure Island Locations has resulted in the issuance of orders by authorized governmental agencies regulating communicable disease.

63.     The business interruption losses sustained by Treasure Island as a result of such civil authority orders issued because of the actual presence of COVID-19 at Treasure Island Locations triggers coverage under the Policy's Communicable Disease – Business Interruption coverage.

### viii.     COVID-19 Triggered the Policy's Ingress/Egress Coverage

64.     COVID-19 and the physical loss and damage it has caused has resulted in the necessary interruption of Treasure Island's business by totally or partially preventing ingress to or egress from Treasure Island Locations as a direct result of physical loss and damage of the type insured to property of the type insured.

65.     The business interruption losses sustained by Treasure Island as a result of the necessary suspension of Treasure Island's business as a result of the total or partial denial of access to Treasure Island Locations triggers coverage under the Policy's Ingress/Egress coverage.

### ix.     COVID-19 Triggered the Policy's Supply Chain Coverage

66.     COVID-19 has caused physical loss and damage of the type insured to property of the type insured at the premises of Treasure Island's direct customers and direct contract service providers, and the direct and indirect suppliers, customers and contract service providers of Treasure Island's direct customers and contract service providers.

67.     The loss of business income sustained by Treasure Island as a result of such supply chain interruption triggers coverage under the Policy's Supply Chain coverage.

### 3.     No Exclusion Impacts Coverage

68.     No exclusion in the Policy applies to preclude or limit coverage for the actual presence of COVID-19 at or away from Treasure Island Locations, the physical loss and damage to property at Treasure Island Locations and/or the business interruption losses that has and will continue to result from the physical loss and damage to property.  To the extent AFM contends any exclusion(s) apply, such exclusion(s) are unenforceable.

### 4.     The Policy's Contamination Exclusion Does Not Apply

69.     The Policy's "Communicable Disease – Property Damage" coverage provides coverage for, among other things, "the reasonable and necessary costs incurred … for the: (a) Cleanup, removal and disposal of … **communicable disease** from insured property."   Exhibit A, at TIPOLICY022.

70.     AFM has stated in writing that COVID-19 meets the definition of **communicable disease** under the Policy.  Exhibit G.

71.     The Policy also contains an exclusion that purports to preclude coverage for "**contamination**."  Exhibit A, at TIPOLICY020.

72.     The Policy defines "**contamination**" as, among other things, a "virus."  Exhibit A, at TIPOLICY057.

73.     The Policy's "**contamination**" exclusion does not exclude coverage for loss caused by "communicable disease."

74.     The Policy's "**contamination**" exclusion does not exclude coverage for Treasure Island's claim.

75.     To the extent AFM contends that the Policy's "**contamination**" exclusion bars coverage for loss caused by "**communicable disease**" or some other aspect of Treasure Island's claim, the Policy is, at best, ambiguous, and therefore, must be construed in favor of coverage.  Century Sur. Co. v. Casino West, Inc., 130 Nev. 395, 398 (2014) (finding pollution exclusion ambiguous and explaining that "[w]e interpret ambiguities in an insurance contract against the drafter, which is typically the insurer.")

### 5.     The Policy's Communicable Disease Sublimit Does Not Cap Treasure Island's Losses

76.     The Policy affords coverage to Treasure Island for the actual presence of "communicable disease" at a Treasure Island Location. This communicable disease coverage is found under two sections of the policy titled "Communicable Disease – Property Damage" and "Communicable Disease – Business Interruption" (together, the "On-Site Sublimited Communicable Disease Coverages").

77.     The On-Site Sublimited Communicable Disease Coverages do not apply to limit any other coverage under the Policy that may also apply to loss or damage resulting from or caused by communicable disease, including physical damage resulting from or caused by communicable disease away from Treasure Island Locations.

78.     Likewise, any sublimit applicable to the On-Site Sublimited Communicable Disease Coverages does not apply to limit any other coverage under the Policy that may also apply to loss or

damage resulting from or caused by communicable disease, including physical damage resulting from or caused by communicable disease away from Treasure Island Locations.

79.     Rather, coverage for covered physical loss and damage, and/or resulting business interruption loss, from or caused by communicable disease, including physical damage resulting from or caused by communicable disease away from Treasure Island Locations, is subject to the Policy limits associated with the coverage or coverages implicated.

**D.     AFM's Bad Faith Conduct**

**i.     AFM Conducted an Inadequate and Improper Investigation of Treasure Island's Claim**

80.     Aware that its Policy affords coverage for COVID-19 losses beyond the On-Site Sublimited Communicable Disease Coverages, AFM devised a plan designed to steer its policyholders, including Treasure Island, into at most, the On-Site Sublimited Communicable Disease Coverages for their COVID-19 losses.

81.     AFM executed that plan in response to Treasure Island's claim.

82.     Treasure Island submitted its claim for coverage under the Policy on March 19, 2020. See Copy of E-mail Notice, attached as Exhibit F.

83.     Three weeks later, on April 9, 2020, AFM's assigned adjuster, David Carroll, called Treasure Island's General Counsel, Brad Anthony, to discuss Treasure Island's claim.

84.     During that call and several subsequent calls, Mr. Anthony explained that Treasure Island's claim was based on the physical loss and/or physical damage to property caused by, among other things, the presence of COVID-19 at Treasure Island Locations and elsewhere, as well as related government orders prohibiting access to Treasure Island Locations and orders mandating that Treasure Island close its doors.

85.     Mr. Carroll ignored Mr. Anthony's statements concerning the prohibition of access to Treasure Island because of civil authority orders issued due to physical damage of the type insured and, instead, shifted the conversation to whether any employees of Treasure Island had tested positive for COVID-19.

86.     In response to Mr. Carroll's question, Mr. Anthony advised that he was uncomfortable disclosing confidential personnel information due to privacy concerns.

87.     AFM failed to further investigate Treasure Island's claimed losses.

88.     Following the April 9 call, Mr. Carroll sent a letter to Mr. Anthony, also dated April 9, 2020, purporting to recap the earlier conversation.  Exhibit G.

89.     The letter failed to accurately recap the conversation.

90.     Mr. Carroll's letter grossly mischaracterized the substance of the telephone conversation and the information that Mr. Anthony provided during the call. In particular, the April 9 letter states – incorrectly:

> Per our discussion, it is our understanding that Treasure Island, LLC was not aware of any employees infected with the virus, nor whether the virus was present at any of the locations. We also understand that there was no physical damage or loss to Insured property at the location.

Exhibit G.

91.     The statements contained in Mr. Carroll's April 9 letter concerning the absence of infected employees and the absence of physical loss or damage to Insured property are false.

92.     The April 9 letter also misstates Mr. Carroll's conversation with Mr. Anthony by omitting any reference to Mr. Anthony's statements about the prohibition of access to Treasure Island due to civil authority orders issued as a direct result of physical damage of the type insured.

93.     The April 9 letter states that coverage is potentially available to clean up, remove and dispose of COVID-19 from Treasure Island because "COVID-19 meets the definition of a **communicable disease** under the [P]olicy."  Exhibit G.

94.     On April 16, 2020, Mr. Carroll sent Treasure Island another letter stating that "coverage is not available [for COVID-19] absent physical loss or damage of the type insured."  Exhibit J.

95.     Again, however, Mr. Carroll omitted material information from the April 16 letter provided by Mr. Anthony regarding the physical loss and/or damage to property sustained by Treasure Island.

### ii.   *AFM's Attempt to Steer Treasure Island Into the Policy's On-Site Sublimited Communicable Disease Coverage*

96.   Based on information and belief, Mr. Carroll's mischaracterization of his telephone call with Mr. Anthony and Mr. Carroll's material omission of facts provided to him as part of his claim investigation was not by accident, but rather a systematic claims handling practice and procedure that AFM has deployed across all COVID-19 claims.

97.   AFM's systematic practice is outlined in a set of "Talking Points" (hereafter, the "AFM Talking Points") prepared for AFM claim adjusters to use to ensure that AFM's adjusters reach the same conclusion for all COVID-19 claims.  (See Copy of Talking Points, attached as Exhibit H.)

98.   The AFM Talking Points explicitly acknowledge that AFM "ha[s] a wide range of clients who may be affected in a variety of ways" by COVID-19.  Exhibit H.

99.   The AFM Talking Points outline only a few of the many different coverages contained in AFM's standard commercial property policies, including policies of the type AFM sold to Treasure Island, that specifically afford coverage for COVID-19 claims.  Exhibit H.

100.   The AFM Talking Points outline certain specific "triggers" of coverage that the adjuster should look for when investigating any COVID-19 claim.  Exhibit H.

101.   But the AFM Talking Points fail to include all of the different "triggers" of coverage that may be implicated by COVID-19 claims.

102.   Among those "triggers" included by AFM in its Talking Points is an employee of the insured that "actually has the communicable disease."  Exhibit H.

103.   Ironically, the AFM Talking Points recognize that some insureds may be unable to disclose that an employee actually has COVID-19 due to medical privacy restrictions.

104.   In fact, the AFM Talking Points specifically address the very same privacy concerns raised by Mr. Anthony during his telephone call with AFM's adjuster, stating "In some jurisdictions, access to medical records is not possible without employee consent."  Exhibit H.

105.   By including only the On-Site Sublimited Communicable Disease Coverages as coverages potentially applicable to a COVID-19 claim, the AFM Talking Points steer adjusters to only seek information that pertains to the On-Site Sublimited Communicable Disease Coverages.

106.     In fact, the AFM Talking Points expressly and unequivocally foreclose the availability of coverage under the Policy's Civil or Military Authority coverage provision.  Exhibit H.

107.     The AFM Talking Points specifically provide:

Q.  Does coverage under Civil or Military Authority apply?

A.  No

Exhibit H.

108.     The AFM Talking Points make similar statements with respect to the Policy's Supply Chain coverage.  Exhibit H.

109.     The AFM Talking Points further instruct that "the presence of a **communicable disease** does not constitute physical damage and is not of the type insured against as a virus falls within the definition of **contamination,** which is excluded."  Exhibit H.

110.     But as alleged above, the Policy AFM sold to Treasure Island expressly recognizes that the presence of communicable disease causes physical damage to property because it provides coverage for the resulting "cleanup, removal and disposal of … **communicable disease**."  Exhibit A, at TIPOLICY022.

111.     Regardless, AFM failed to conduct any investigation with respect to Treasure Island's claim to determine whether Treasure Island had in fact sustained physical loss or damage as a result of communicable disease.

112.     The AFM Talking Points direct the claims adjuster to reach conclusions without considering the specific facts of the particular claim and without considering the applicable law that governs interpretation of the relevant insurance policy.

113.     Instead, the AFM Talking Points coach the adjuster to suggestively steer the policyholder toward the On-Site Sublimited Communicable Disease Coverages, which provide only a fraction of the coverage limits otherwise available under the Policy.

114.     The AFM Talking Points are contrary to the accepted practices of good faith insurance claim handling.

115.     AFM's practice and procedure constitutes an unfair or deceptive act or practice in the business of insurance.

15

116.   AFM's use of the Talking Points reflects a conscious disregard of the policyholder's rights under the policy.

117.   On May 7, 2020, Treasure Island sent a letter to AFM in response to Mr. Carroll's April 9, 2020 letter, correcting Mr. Carroll's misstatements, and noting AFM's conflicting coverage positions.   Treasure Island requested that AFM reconsider its coverage denial and acknowledge coverage for Treasure Island's claim.  (See Letter from Brad Anthony, dated May 7, 2020, attached as Exhibit I.)

118.   AFM has not responded to Treasure Island's request.

119.   AFM continues to refuse to pay Treasure Island's claim and has effectively denied its claim.

120.   AFM knowingly or recklessly failed to conduct a reasonable investigation of Treasure Island's claim and, therefore, the basis for AFM's denial is unreasonable.

121.   In denying Treasure Island's claim, AFM knew its denial lacked any reasonable basis.

122.   In denying Treasure Island's claim, AFM failed to faithfully apply its own Policy language, failed to conduct a reasonable investigation, and failed to consider the facts relevant to Treasure Island's claim against the Policy language as interpreted pursuant to Nevada law.

123.   As a consequence of AFM's bad faith conduct, including its wrongful denial and inadequate claim investigation, Treasure Island has suffered and continues to suffer significant damages.

**COUNT I**

Declaratory Judgment

124.   Treasure Island repeats and realleges the allegations in the preceding paragraphs.

125.   Treasure Island seeks the Court's declaration of the parties' rights and duties under the Policy pursuant to 28 U.S.C. § 2201.  A justiciable controversy exists between Treasure Island and AFM concerning the availability of coverage under the Policy for Treasure Island's claim.

126.   The controversy between Treasure Island and AFM is ripe for judicial review.

127.     Nevada has adopted the Uniform Declaratory Judgment Act for purposes of declaring parties' right in this precise circumstance.

128.     Accordingly, Treasure Island seeks a declaration from the Court that:

 a. The various coverage provisions identified herein are triggered by Treasure Island's claim;

 b. No Policy exclusion applies to bar or limit coverage for Treasure Island's claim; and

 c. The Policy covers Treasure Island's claim.

**COUNT II**

<u>Breach of Contract</u>
<u>(Property Damage)</u>

129.     Treasure Island repeats and realleges the allegations in the preceding paragraphs.

130.     The Policy is a valid and enforceable contract between Treasure Island and AFM.

131.     In the Policy, AFM agreed to cover property against all risks of physical loss or damage not otherwise excluded.

132.     COVID-19 has caused and is continuing to cause physical loss and/or physical damage to Treasure Island's property.

133.     No exclusions apply to bar coverage.

134.     Treasure Island is entitled to coverage for the physical loss and/or damage up to the Policy's $850 million limit of liability or any applicable sublimits.

135.     Treasure Island complied with all applicable Policy provisions, including paying premiums and providing timely notice of its claim.

136.     Nonetheless, AFM unjustifiably refuses to pay for Treasure Island's physical loss or damage in breach the Policy.

137.     Treasure Island has suffered and continues to suffer damages as a result of AFM's breach of the Policy.

138.     Treasure Island is entitled to damages as a result of AFM's breach in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

**COUNT III**

Breach of Contract
(Business Interruption)

139.   Treasure Island repeats and realleges the allegations in the preceding paragraphs.

140.   The Policy is a valid and enforceable contract between Treasure Island and AFM.

141.   In the Policy, AFM agreed to cover Business Interruption loss and incurred Extra Expense, as provided in the Business Interruption Coverage Extensions, as a direct result of physical loss or damage of the type insured under the Policy.

142.   COVID-19 has caused and, upon information and belief, is continuing to cause physical loss and/or physical damage to Treasure Island's property and the property of others that has caused Treasure Island to suffer business interruption losses and incur extra expenses.

143.   No exclusions apply to bar coverage.

144.   Treasure Island is entitled to coverage for its business interruption losses and incurred extra expenses related to COVID-19 up to the Policy's $327 million limit of liability or any applicable sublimits.

145.   Treasure Island complied with all applicable Policy provisions, including paying premiums and providing timely notice of its claim.

146.   Nonetheless, AFM unjustifiably refuses to pay for these losses and expenses in breach the Policy.

147.   Treasure Island has suffered and continues to suffer damages as a result of AFM's breach of the Policy.

148.   Treasure Island is entitled to damages as a result of AFM's breach in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

**COUNT IV**

Breach of Contract
(Business Interruption Coverage Extensions)

149.   Treasure Island repeats and realleges the allegations in the preceding paragraphs.

150. The Policy is a valid and enforceable contract between Treasure Island and AFM.

151. In the Policy, AFM agreed to afford coverage for Business Interruption loss as provided in the Policy's Business Interruption Coverage Extensions.

152. COVID-19 has caused and, upon information and belief, is continuing to cause physical loss and/or physical damage to Treasure Island's property and the property of others that has caused Treasure Island to suffer business interruption losses covered under the Policy's Business Interruption Coverage Extensions.

153. No exclusions apply to bar coverage.

154. Treasure Island is entitled to coverage for its business interruption losses related to COVID-19 up to each Business Interruption Coverage Extensions' limit of liability or any applicable sublimits.

155. Treasure Island complied with all applicable Policy provisions, including paying premiums and providing timely notice of its claim.

156. Nonetheless, AFM unjustifiably refuses to pay for these losses and expenses in breach the Policy.

157. Treasure Island has suffered and continues to suffer damages as a result of AFM's breach of the Policy.

158. Treasure Island is entitled to damages as a result of AFM's breach in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

**COUNT V**

Breach of the Covenant of Good Faith and Fair Dealing

159. Treasure Island repeats and realleges the allegations in the preceding paragraphs.

160. AFM has denied Treasure Island's claim for coverage under the Policy relating to its losses from COVID-19.

161. AFM's denial of Treasure Island's claim lacks any reasonable basis.

162.   AFM failed to conduct a reasonable investigation of Treasure Island's claim under the Policy and, therefore, AFM's basis for its denial is unreasonable.

163.   AFM employed a systematic "one-size-fits-all" approach to adjusting and denying coverage for all COVID-19 claims, including Treasure Island's claim.

164.   AFM knew or was actually or implicitly aware of the lack of any reasonable basis to deny coverage.

165.   AFM acted with reckless disregard as to the unreasonableness of its denial.

166.   AFM breached its duty of good faith and fair dealing by failing to reasonably investigate Treasure Island's claim and provide coverage.

167.   AFM's denial of coverage constitutes bad faith.

168.   As a result of AFM's bad faith, Treasure Island has suffered and is continuing to suffer damages.

169.   Treasure Island is entitled to an award of damages as a result of AFM's bad faith in an amount to be determined at trial, including attorney's fees, pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

**COUNT VI**

Violation of the Nevada Unfair Claims Practices Act - NRS 686A.310

170.   Treasure Island repeats and realleges the allegations in the preceding paragraphs.

171.   AFM's systemic practice of mischaracterizing the facts provided by policyholders in connection with claims for coverage for losses from COVID-19 constitutes an unfair or deceptive act or practice in the business of insurance pursuant to NRS 686A.310(a).

172.   AFM's systemic practice of attempting to influence and direct policyholders' claims for coverage for losses from COVID-19 to the On-Site Sublimited Communicable Disease Coverages constitutes an unfair or deceptive act or practice in the business of insurance pursuant to NRS 686A.310(a), (c) and (l).

173.   AFM's use of the AFM Talking Points with pre-determined conclusions regarding coverage for claims based on losses from COVID-19 without consideration of the particular facts or

applicable law constitutes an unfair or deceptive act or practice in the business of insurance pursuant to NRS 686A.310(a), (c) and (n).

174.    AFM's use of the AFM Talking Points designed to coach its claim adjusters to steer the policyholder to the On-Site Sublimited Communicable Disease Coverages constitutes an unfair or deceptive act or practice in the business of insurance pursuant to NRS 686A.310(a), (c), (l) and (n).

175.    AFM's systemic practice and policy of denying coverage for claims by policyholders for losses from COVID-19 without conducting an adequate investigation of the facts and the applicable law constitutes an unfair or deceptive act or practice in the business of insurance pursuant to NRS 686A.310(a), (c) and (n).

176.    AFM has failed to adopt and implement reasonable standards for the prompt investigation and processing of claims related to losses based on COVID-19, which constitutes a violation of NRS 686A.310(c) and (n).

177.    AFM's systemic practices and procedures have compelled Treasure Island to institute this litigation to recover amounts due under the Policy by attempting to restrict Treasure Island's recovery to the limited coverage available for communicable disease, which constitutes a violation of NRS 686A.310(f).

178.    As a result of AFM's unfair or deceptive acts or practices, Treasure Island has suffered and is continuing to suffer damages.

179.    Treasure Island is entitled to an award of damages as a result of AFM's unfair or deceptive acts or practices in an amount to be determined at trial, including attorney's fees, pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## PRAYER FOR RELIEF

**Wherefore**, Treasure Island prays for judgment against AFM as follows:

1)    A declaration from the Court that:

a.    The various coverage provisions identified herein are triggered by Treasure Island's claim;

b.    No Policy exclusion applies to bar or limit coverage for Treasure Island's claim; and

c. The Policy covers Treasure Island's claim.

2) For special and consequential damages against AFM in an amount in to be proved at trial in excess of $75,000.00;

3) Pre and Post-judgment interest as provided by law;

4) An award of attorney's fees and costs of suit incurred; and

5) For such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Treasure Island demands trial by jury on all issues so triable.


Date:  May 28, 2020

Respectfully submitted,
PLAINTIFF TREASURE ISLAND, LLC
By and through its attorneys,

*/s/ Renee M. Finch*
Renee M. Finch, Esq.
Nevada State Bar 13118
MESSNER REEVES LLP
8945 W. Russell Road, Suite 300
Las Vegas, NV 89148
Phone: (702) 363-5100
Email: *rfinch@messner.com*

Michael S. Levine (*pro hac vice* forthcoming)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037
Phone: (202) 955-1500
Email: *mlevine@hunton.com*

Kevin V. Small (*pro hac vice* forthcoming)
HUNTON ANDREWS KURTH LLP
200 Park Ave, 52 Fl.
New York, NY 10166
Phone: (212) 309-1226
Email: *ksmall@hunton.com*

Harry L. Manion, III (*pro hac vice* forthcoming)
Christopher Cunio (*pro hac vice* forthcoming)
HUNTON ANDREWS KURTH LLP
60 State Street, Suite 2400
Boston, MA 02109
Phone: (617) 648-2800

22

Fax: (617) 433-5022
Email: *hmanion@hunton.com*
Email: *ccunio@hunton.com*

23