# EXHIBIT A

**AFM's Memorandum in Support of Motion for Partial Summary Judgment, Retail Brands Alliance, Inc. v. Factory Mut. Ins. Co., Inc., Case No. 1:05-cv-01031-RJH-HBP, (S.D.N.Y.), (Dkt. No. 112, filed April 4, 2009)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Retail Brand Alliance, Inc.

                   Plaintiff,

    -against-

Factory Mutual Insurance Company,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CIVIL ACTION NO.: 05-CV-1031(RJH)

**DEFENDANT'S MEMORANDUM IN**
**SUPPORT OF ITS MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

**Robins, Kaplan, Miller & Ciresi L.L.P.**

David S. Evinger
Terrence R. Joy
Emily P. Hennen
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015
612-349-8500

80681321.3

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................ii

FACTS.......................................................................................................................... 1

ISSUE ......................................................................................................................... 4

STANDARD OF REVIEW ............................................................................................. 4

ARGUMENT ............................................................................................................... 5

I.     The length of the Period of Liability and the value of RBA's business
interruption loss during that Period are separate questions under the Policy........... 5

     A.    The length of the Period of Liability ............................................................. 6

     B.    The value of RBA's business interruption during the Period of Liability .... 8

II.    FM Global's measurement of RBA's business interruption is supported by the
Policy and by caselaw ........................................................................................... 10

     A.    FM Global's application of the Policy is supported by applicable caselaw 10

     B.    Under the Policy, FM Global must assume that RBA's stores suffered no
interruption of business and continued to operate in the same Lower
Manhattan marketplace .............................................................................. 14

CONCLUSION ........................................................................................................ 17

## TABLE OF AUTHORITIES

**Page**

**Cases**

*American Auto Ins. v. Fisherman's Paradise*,
    1994 WL 120238 (S.D. Fla. 1994) ........................................................................ 12

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
    411 F.3d 384 (2d Cir. 2005) .................................................................................... 7

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,
    219 F.3d 104 (2d Cir. 2000) .................................................................................... 4

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
    309 F.3d 76 (2d Cir. 2002) ...................................................................................... 5

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
    365 F.Supp.2d 434 (S.D.N.Y. 2005) ...................................................................... 5

*Levitz Furniture Corp. v. Houston Cas. Co.*,
    1997 WL 218256 (E.D. La. 1997) .................................................................. 13, 16

*Prudential LMI Commercial Ins. Co. v. Colleton Enterprises, Inc.*,
    976 F.2d 727, 1992 WL 252507 (4th Cir. 1992) ............................................ 11, 12

*Retail Brand Alliance, Inc. v. Factory Mut. Ins. Co.*,
    489 F.Supp.2d 326, 331 (S.D.N.Y.  2007) ...................................................... 2, 6, 7

*Streamline Capital, L.L.C. v. Hartford Cas. Ins. Co.*,
    No. 02 Civ 8123NRB, 2003 WL 22004888 (S.D.N.Y. Aug. 22, 2003) ................. 4

*The Hit Factory, Inc. v. Royal Ins. Co. of America*,
    No. 02 Civ. 4068DAB, 2005 WL 2125803 (S.D.N.Y. Aug. 26, 2005) .................. 5

**Statutes**

Fed. R. Civ. P. 56(c) ...................................................................................................... 4

80681321.3

**Other Authorities**

Merriam-Webster Online Dictionary. 2008 ........................................................................ 9

Defendant Factory Mutual Insurance Company ("FM Global") hereby submits this Memorandum in support of its Motion for Partial Summary Judgment under Rule 56(d). FM Global asks this Court to apply the clear and unambiguous language of the insurance contract and uphold FM Global's consideration of the real world, post-9/11 market conditions in Lower Manhattan in measuring Retail Brand Alliance, Inc.'s business interruption loss.

## FACTS

Prior to September 11, 2001, Plaintiff Retail Brand Alliance, Inc. ("RBA") operated three retail stores in the World Trade Center in New York City, New York. RBA purchased property and business interruption insurance for the Casual Corner, Petite Sophisticate, and August Max Woman brand stores nationwide through FM Global, under policy number NB334.  *See* Hennen Decl., Exhibit A (Policy NB334 issued by FM Global to RBA for Policy period February 1, 2000 to February 1, 2001, and extended to February 1, 2002, (FMRBA 000244 – 000300)).

On September 11, 2001, the Casual Corner, Petite Sophisticate, and August Max Woman stores located in the World Trade Center were destroyed.  RBA submitted a claim for property damage and business interruption to its insurer, FM Global.  FM Global began adjusting the three separate claims.

The parties resolved RBA's property loss claim and FM Global paid $2,034,891 for the three stores' combined property claims.   The parties reached an impasse in the adjustment of RBA's business interruption and professional fees claim and FM Global paid $1,852,049 for these combined claims.  RBA began litigation against FM Global

concerning its business interruption and professional fees claims in January of 2005.  The business interruption claim disputes have raised the most significant issues in this litigation.  First, RBA disputed FM Global's measurement of the Period of Liability under the Policy.  In May 2007, granting partial summary judgment for FM Global, this Court ruled that under the clear and unambiguous terms of the Policy, the length of the Period of Liability must not be tied to the rebuilding of the World Trade Center, and extends only to that theoretical time necessary for RBA to build "reasonably equivalent stores in a reasonably equivalent location."  *Retail Brand Alliance, Inc. v. Factory Mut. Ins. Co.*, 489 F.Supp.2d 326, 331 (S.D.N.Y.  2007).  Second, RBA added a claim under the Leasehold Interest provision of the Policy.  This Court again applied the clear and unambiguous language of the Policy and granted partial summary judgment for FM Global and dismissed RBA's claim under the Leasehold Interest provision of the Policy.  March 18, 2009 Order.  Finally, RBA disputed FM Global's method of calculating the amount of its business interruption claim.

The issues still in dispute between the parties include: the actual length of the Period of Liability; the amount of non-continuing expenses included in RBA's claim; the measurement of RBA's business interruption claim; and the amount of RBA's Professional Fees claim.  This Motion addresses the specific contract language pertinent to FM Global's measurement of RBA's business interruption losses during the Period of Liability.

80681321.3

In determining the amount of RBA's business interruption losses, it is necessary to review and apply two parts of the insurance contract.   The Policy's Time Element Coverages are defined in Section C, which states:

> Except as respects LEASEHOLD INTEREST, in determining the amount of loss payable, the Company *will consider* the experience of the business before and after and the *probable experience during* the PERIOD OF LIABILITY.

Section C.1.D., FMRBA 00272 (emphasis added).   In measuring Gross Earnings coverage, the Policy provides that:

> In determining the indemnity payable as the actual loss sustained, company *will consider* a continuation of only those normal charges and expenses that would have been earned *had no interruption of production or suspension of business operations or services occurred*.

Section C.2.A.b., FMRBA 00273 (emphasis added).   Pursuant to these Policy provisions, FM Global projected RBA's business interruption loss as though 9/11 had occurred, but RBA's stores had survived and continued to do business in Lower Manhattan.   This method of calculation is FM Global's standard approach to business interruption claims. See Affidavit of Brian Cook, ¶ 4, attached to Hennen Decl. as Exhibit B.  Due to a variety of declining market conditions before 9/11, combined with the events of 9/11, FM Global projected that RBA's retail clothing stores would have experienced a decreased volume in sales in a post-9/11 Lower Manhattan marketplace.   RBA, on the other hand, assumed that there were no declining market conditions and that 9/11 had not occurred.   Rather, despite the actual existing market conditions, RBA projected that its sales would have increased by 20% post-9/11 over year 2000 sales.   The parties disagree on whether it is appropriate to take the actual post-9/11 economic conditions in Lower Manhattan into

account when measuring RBA's business interruption loss. Because the contract explicitly requires the contracting parties to do so, FM Global now requests partial summary judgment on that issue. Specifically, FM Global asks this Court to find that, pursuant to the clear and unambiguous language contained in Sections C.1.D. and C.2.A.b. of the insurance contract, in measuring the amount of RBA's business interruption loss during the Period of Liability, the parties must consider the probable experience of the subject RBA stores during the Period of Liability as though no interruption of said stores' business had occurred as a result of the events of 9/11.

## ISSUE

Does Policy No. NB334 require the contracting parties to consider the probable experience of RBA's business during the Period of Liability?

## STANDARD OF REVIEW

A court should grant summary judgment when there is no "genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000). The Court should draw all reasonable inferences in favor of the non-moving party, and should grant summary judgment only where no reasonable trier of fact could find in the non-moving party's favor. *Streamline Capital, L.L.C. v. Hartford Cas. Ins. Co.*, No. 02 Civ. 8123NRB, 2003 WL 22004888, * 2 (S.D.N.Y. Aug. 22, 2003). "When the summary judgment motion concerns the construction of an insurance policy, New York law dictates that 'the initial interpretation of a contract is a matter of law for the court to decide.'" *The Hit Factory, Inc. v. Royal Ins. Co. of America*, No. 02 Civ.

- 4 -

4068DAB, 2005 WL 2125803, *3 (S.D.N.Y. Aug. 26, 2005) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).   If neither party argues that the language of the policy is ambiguous, the interpretation remains a question of law for the court.   *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 365 F.Supp.2d 434, 440 (S.D.N.Y. 2005).

Here, the Policy unambiguously directs FM Global to consider the probable experience of an insured during the Period of Liability and to assume that the loss-causing event occurred, but that the insured business survived.   Because FM Global's adjustment of RBA's claim is consistent with these directives, FM Global is entitled to partial summary judgment.

## ARGUMENT

**I.      The length of the Period of Liability and the value of RBA's business interruption loss during that Period are separate questions under the Policy.**

FM Global's Policy directs that business interruption claims are to be adjusted as though the occurrence happened, but the insured's business was not interrupted and continued to operate.   It is important to understand that under the FM Global Policy at issue here, there are two major components to a business interruption claim:  the length of the Period of Liability and the measurement of the insured's lost business during the Period of Liability.   Because these components are separate and distinct, it is useful to address them separately here.

80681321.3

A.    **The length of the Period of Liability**

The length of the Period of Liability is determined under Section C.4.A. of the

Policy.  This provision states:

> 1) For building and equipment, the period:
>
> a) starting from the time of physical loss or damage of the type insured against; and
>
> b) ending when with due diligence and dispatch the building and equipment could be:
>
>> (i) repaired or replaced; and
>>
>> (ii) made ready for operations,
>>
>> under the same or equivalent physical and operating conditions that existed prior to the damage.
>
> c) not to be limited by the expiration of this Policy.

Policy No. NB334, p. 34, Attached to Affidavit of Emily P. Hennen as Exhibit A.  As this

Court previously ruled, the terms of this provision are clear and unambiguous and are

explicitly tied to the insured's "building and equipment."  *Retail Brand Alliance, Inc. v.*

*Factory Mut. Ins. Co.*, 489 F.Supp.2d 326, 331 (S.D.N.Y.  2007).  The sole function of

this provision is to define an endpoint to the insured's business interruption loss by

measuring the theoretical time it would take the insured to repair or replace its building

and equipment.   The Period of Liability provision does not reference and does not

address how to measure the insured's sales revenues or business conditions. That is not

its purpose.  Indeed, in its prior Order, this Court noted that:

> it would be nonsensical to interpret the Period of Liability as extending until the building and equipment are restored to the same 'sales environment' or 'profit-earning potential' as these conditions are irrelevant

to the operation of building and equipment.  Instead, the Policy reimburses the insured for Gross Earnings and Extra Expenses during the period in which the building and equipment are being made ready to operate in the same manner that they did prior to the damage that triggered coverage.

(…)

Because the period of Liability is tied to the condition of the insured's building and equipment, and not to the condition of its business, the Period of Liability may terminate while the insured is still losing sales.

*Retail Brand Alliance, Inc.*, 489 F.Supp. at 331.  The Period of Liability is a time frame and nothing more.

In applying relevant caselaw to the contract here, this Court noted that under *Duane Reade*, business interruption coverage should continue until the insured can build a "reasonably equivalent store in a reasonably equivalent location."  *Id.* at 334 (quoting *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 393 (2d Cir. 2005)). Nothing in this language "unhooks" the length of the Period of Liability from the insured's building and equipment.  Neither does it require that FM Global continue business interruption coverage until the insured can build an identical store in an identical retail environment, as RBA has argued.

The contract guarantees that business interruption insurance will continue until the replacement store can be "made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage."  As this Court has already ruled, "this phrase does not create a requirement for an equivalent flow of foot traffic."  *Id*. at 333.  The contract does not, and frankly could not, guarantee that an insured will achieve the same level of business that it enjoyed prior to a loss.  Myriad

- 7 -

factors such as a changing economy or shifting customer trends might prevent an insured from ever regaining its pre-loss level of sales, making defining the Period of Liability extremely difficult if it is tied to business conditions.  But the Period of Liability must have a calculable endpoint.  Accordingly, the length of the Period of Liability is limited to the time necessary for the insured to rebuild its building and equipment and make them ready to operate at the same or equivalent physical and operating conditions.  This theoretical rebuilding of RBA's three stores could be accomplished in a number of appropriate locations, and the Period of Liability ends when RBA should theoretically be able to open reasonably equivalent stores at a reasonable alternative location.

The Period of Liability only sets the time frame for RBA's business interruption loss.  The next step under the Policy is to measure the actual amount of the loss that the subject RBA stores sustained.  That is, what volume of business interruption did RBA sustain because the subject stores were not open during the Period of Liability.  This measurement is not governed by the terms of the Period of Liability and must be addressed separately.

**B.    The value of RBA's business interruption during the Period of Liability.**

As stated above, once the length of the Period of Liability under Section C.4.A.1 has been established, the adjustment of a business interruption loss under the Policy moves to the separate task of measuring the value of the insured's loss during that Period. This measurement is governed by Section C.1.D. of the Policy, which states:

> Except as respects LEASEHOLD INTEREST, in determining the amount of loss payable, the Company *will consider* the experience of the business

- 8 -

before and after and the *probable experience during* the PERIOD OF LIABILITY.

(emphasis added)   Section C.1.D. works in conjunction with Section C.2.A.b., which

directs FM Global to apply the following:

> In determining the indemnity payable as the actual loss sustained, company *will consider* a continuation of only those normal charges and expenses that would have been earned *had no interruption of production or suspension of business operations or services occurred.*

(emphasis added)   These provisions acknowledge that a loss-causing event has occurred

and there is some Period of Liability during which a loss of income will be sustained.

The provisions also dictate that FM Global will look at the stores' business experience

during three time periods in measuring the loss:   (1) the time before the Period of

Liability (pre-loss); (2) the time after the Period of Liability (after replacement stores are

opened); (3) and the time during the Period of Liability (from the time of the loss to the

possible opening of replacement stores).

Because the stores would not be operating during the Period of Liability, the

calculation of their lost sales during that time is necessarily a projection.  Pursuant to the

contract, this projection must reflect the *probable* experience of the stores during the

Period of Liability.  "Probable" is generally defined as "likely to be or become true or

real."    Merriam-Webster   Online   Dictionary.   2008,   <http://www.merriam-

webster.com/dictionary/probable>.  In other words, the contract looks at what the real

experience of the stores would likely have been had their business not been interrupted.

Here, FM Global examined RBA's likely experience in Lower Manhattan had its

WTC stores suffered no physical loss or damage on 9/11 and continued to operate.  FM

Global took into account the actual economic conditions in Lower Manhattan that existed after 9/11, whether brought about by 9/11 itself or reflective of other market conditions such as an overall decline in the economy in the months prior to and after 9/11.  Under the contract, this is the most accurate method of projecting what RBA's sales might have been during the Period of Liability had its stores not suffered an interruption of business on 9/11. Partial summary judgment for FM Global is appropriate.

II.    **FM Global's measurement of RBA's business interruption is supported by the Policy and by caselaw.**

The Period of Liability and Loss Measurement provisions of the contract have separate and distinct functions.  The contract language found in Sections C.1.D. and C.2.A.b. explicitly directs the contracting parties to consider the real world situation after 9/11 occurred and make the theoretical assumption that RBA's stores did not suffer any interruption of business and continued to operate in Lower Manhattan.  This approach is also supported by caselaw, and is a common-sense approach to the loss.

A.    **FM Global's application of the Policy is supported by applicable caselaw.**

As described above, the subject contract language directs FM Global to assume that an insured's business was not interrupted by a loss-causing event.  Here, FM Global assumed that 9/11 occurred, but that RBA's three stores did not suffer an interruption of business and continued to operate.  As required by the contract, FM Global assumed no interruption of RBA's business.   FM Global's measurement of RBA's business interruption loss is thus based on  a projection of the three stores' probable experience in a post-9/11 marketplace.

80681321.3

Based on different, if not opposite insurance contract language, some courts have held that the contracting parties may not take into account post-loss economic conditions in measuring an insured's loss after a catastrophic event.[1]  There does not appear to be any case that provides binding precedent for this Court, but the cases are nonetheless helpful in illustrating why the language that is found in the FM Global insurance contract has been interpreted and applied as FM Global suggests.

First, there are cases in which courts have ruled that the insured's claim must be measured as if the covered peril or loss-causing event had not occurred.  For example, in *Prudential LMI Commercial Ins. Co. v. Colleton Enterprises, Inc.*, 976 F.2d 727, 1992 WL 252507 (4th Cir. 1992), an Econo Lodge hotel in South Carolina was damaged by Hurricane Hugo.  Id at *1.  Colleton, the owner of the hotel, argued that its business interruption claim should include those profits it would have been able to earn had the hotel been open after the hurricane and able to house rescue workers and others in need of shelter.  *Id.*  The District of South Carolina agreed and awarded Colleton $192,254 in lost profits, even though evidence showed that the hotel had recorded losses for the 32-month period preceding Hurricane Hugo.  *Id.*   The policy in question stated that it would measure loss according to the earnings of the business "before the date of damage or destruction and … the probable earnings thereafter, *had no loss occurred*."   *Id.* (emphasis added). On appeal, the Fourth Circuit held that the phrase "had no loss occurred" meant that the insured must be treated as though the covered peril – Hurricane

---

[1] It is worth noting that only in the face of relatively uncommon widespread catastrophes does FM Global's approach become an issue.  This point will be discussed further below.

Hugo – had not occurred.  Had Hurricane Hugo not occurred, there would have been no influx of temporary residents and the Econo Lodge would have continued to operate at a loss.  *Id*. at *3-*4.  The insured could recover only what it would have earned had the loss-causing event not occurred.  *Id*.

Similarly, in *American Auto Ins. v. Fisherman's Paradise*, 1994 WL 120238 (S.D. Fla. 1994), a boating retailer was damaged by Hurricane Andrew.  *Fisherman's Paradise*, 1994 WL 120238 at *2.  The insured argued that it should be able to recover the profits it would have earned had its store survived the hurricane and been able to meet the increased post-hurricane demand for boats.  *Id*.  The policy at issue provided that in determining the amount of loss, the insurer would look to the likely net income of the business "if no loss or damage occurred."  *Id*. at *3.  Citing *Colleton*, the Southern District of Florida ruled that the phrase "if no loss or damage occurred" meant that the loss would be measured as if no hurricane had occurred, and the insured could recover only what it would have earned under those circumstances.  *Id*.

In both of the above cases, the policy language involved is different from the Policy language here.  Both *Colleton* and *American Auto* involved policies that measured the loss payable as if *no loss had occurred*.  *Colleton*, 976 F.2d at *1; *American Auto*, 1994 WL 120238 at *3.  In contrast, under the FM Global Policy, the parties are required to consider the "probable experience" of the business "during the Period of Liability" and measure the loss payable as if "no interruption of production or suspension of business operations" occurred.  Under the FM Global language, the insured's claim is measured as though the event (here 9/11) occurred, but the insured business suffered no interruption.

- 12 -

A case addressing policy language very similar to FM Global's is *Levitz Furniture Corp. v. Houston Cas. Co.*, 1997 WL 218256 (E.D. La. 1997).   There, the insured furniture business sought to recover the increased profits it claimed it would have earned in the time directly after a hurricane, when many customers needed to replace lost furniture.   *Levitz,* 1997 WL 218256 at *1.   The policy in question stated that the insurer would consider the "experience of the business before the Period of Interruption and the Probable experience thereafter," and would measure the loss as though "no interruption of production or suspension of business operations or services occurred."   *Id.* at *3.   The Eastern District of Louisiana drew a distinction between the phrases "no loss" and "no interruption."   *Id.*   The court noted that "'no loss' means no damage; i.e. no flood, and 'no interruption' means no business stoppage."   *Id.*   The court found that under that policy language, Levitz' business interruption claim should include "consideration of earnings 'that would have existed' had no business interruption occurred, i.e., had Levitz not been forced to close after the flood."   *Id.*   Levitz was thus allowed to recover lost profits due to increased customer demand after the hurricane.   *Id.*

Of the three cases discussed above, only *Levitz* is apposite, as it addresses policy language almost identical to that found in the FM Global Policy.   Like the policy in *Levitz*, the FM Global Policy distinguishes between "loss" and "interruption" in measuring an insured's business interruption claim.   Because RBA's claim must be measured as if no "interruption" occurred, FM Global correctly based its projections on the assumption that 9/11 did occur, but that RBA's stores suffered no interruption of business were able to continue operating after that event.   This approach is consistent

- 13 -

with the contract language and summary judgment in favor of FM Global on this issue is appropriate.

**B.      Under the Policy, FM Global must assume that RBA's stores suffered no interruption of business and continued to operate in the same Lower Manhattan marketplace.**

To assure the most accurate projection of the stores probable experience during the Period of Liability, FM Global must also assume that the stores continued to do business in the same general marketplace as prior to 9/11.  It would be nonsensical to measure the business loss of the three stores in a marketplace other than Lower Manhattan, where they actually existed prior to the 9/11.  The experience of stores located in other parts of Manhattan or even other cities cannot reasonably be said to be an accurate representation of the probable experience of the WTC stores.  The probable experience of the destroyed stores can only sensibly be measured by assuming the stores continued to operate and serve customers in the Lower Manhattan marketplace in which they existed prior to 9/11.

Had the attack on 9/11 not destroyed the entire WTC and some of the immediately surrounding area, FM Global would have assumed the stores continued to operate in the existing WTC Mall and measured their loss accordingly.  But, 9/11 was an extraordinary event preventing any public access to the actual WTC site for some time.  To ensure a fair evaluation of RBA's probable experience during the Period of Liability, FM Global and its expert, W. Mark Bremer of Stax, Inc., assumed that RBA's stores continued to be able to serve their customers in the immediate vicinity of the WTC site.  While Ground Zero was destroyed and was inaccessible for some period of time; many businesses continued to operate or were quickly able to reopen in the immediately surrounding area.

- 14 -

There could not have been any customers on the actual Ground Zero site, but people did return to, and businesses did open in the surrounding neighborhoods.  Measuring RBA's lost sales according to the probable experience of a store up to one mile from Ground Zero allowed service to customers to occur and for the possibility of some sales (which could then be recovered under the contract), while still ensuring that the projections conformed with the market conditions that the stores would have experienced had they survived 9/11.

FM Global's assumption that RBA's three stores continued to operate up to one mile from Ground Zero is a fair and reasonable assumption for purposes of measuring the loss that the subject stores would have sustained in the marketplace in which they would have existed after 9/11.  The contract does not designate this "one mile assumption."  FM Global and its experts realized that the three RBA stores needed to be accessible to customers, and looked at the market conditions in Lower Manhattan and determined that a store operating within one mile of Ground Zero would provide the most reasonable and accurate projection of what the RBA stores would have experienced had they continued to operate after 9/11.

It must be made clear that the "one mile assumption" has no relation to the Period of Liability and is not a requirement that RBA rebuild its stores within one mile of the WTC site.  The question of where replacement stores are located is an issue addressed by the Policy's Property coverage provisions (which were never at issue in this litigation), and by the Period of Liability.  FM Global made the "one mile assumption" solely for the purposes of projecting and measuring the probable experience of the WTC stores in the

- 15 -

marketplace that existed in Lower Manhattan had they survived 9/11 and continued to operate without interruption.   Due to the depressed economic conditions in the marketplace surrounding Ground Zero after 9/11, Mr. Bremer projected a downward trend in RBA's sales after the loss.   As explained above, FM Global did project that RBA's stores, had they survived, would have had some level of sales, and FM Global paid RBA $1,769,439 as FM Global's measurement of RBA's lost sales during the Period of Liability.

Although in this case FM Global projected a decrease in RBA's sales due to the changed market conditions in Lower Manhattan after 9/11, many insureds could have had an opposite experience.   Under the FM Global Policy language, an insured's loss must be measured as though the loss-causing occurrence happened, but the insured survived. Here, clothing retailers in Lower Manhattan saw a decline in sales post-9/11, but many other businesses might have seen an increase in business due to the influx of rescue workers, insurance adjusters, and media personnel.   Consistent with *Levitz*, FM Global would adjust those insureds' claims to include any increased sales they experienced had they survived 9/11 and continued to operate.   That RBA's retail clothing business was negatively affected instead does not invalidate the clear and unambiguous language of the FM Global insurance contract.   FM Global adjusted RBA's claim fairly and in conformity with the Policy and relevant caselaw, and summary judgment is appropriate on this issue.

80681321.3

## <u>CONCLUSION</u>

FM Global applied the clear and unambiguous terms of the insurance contract and projected RBA's business interruption loss during the Period of Liability by assuming that 9/11 occurred, but that RBA's business in Lower Manhattan was not interrupted.  FM Global's application of the contract language is supported by caselaw and does not lead to an inequitable result.  For that reason, FM Global asks this Court to uphold FM Global's application of Sections C.1.D. and C.2.A.b of the Policy to RBA's claim and grant partial summary judgment in FM Global's favor.

Dated: Minneapolis, Minnesota.          Respectfully submitted,
      April 15, 2009

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**


By: /s/ Emily P. Hennen
    David S. Evinger
    Terrence R. Joy
    Emily P. Hennen
    2800 LaSalle Plaza
    800 LaSalle Avenue
    Minneapolis, MN  55402-2015
    612-349-8500

     -and-

    PODVEY, MEANOR, CATENACCI, HILDNER, COCOZIELLO & CHATTMAN, P.C.
    Henry J. Catenacci (HC 8376)
    Helaine Miller (HM 8945)
    The Legal Center
    One Riverfront Plaza - 8th Floor
    Newark, NJ 07102
    (973) 623-1000

    400 Park Avenue
    Suite 1420
    New York, New York 10022
    (212) 432-7419


    *Attorneys for Defendant*
    *Factory Mutual Insurance Company*

80681321.3