UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
LAS VEGAS DIVISION


TREASURE ISLAND, LLC,      ) CASE NO: 2:20-CV-00965-JCM-EJY
                           )
              Plaintiff,   )           CIVIL
                           )
     vs.                   )        Las Vegas, Nevada
                           )
AFFILIATED FM INSURANCE    )    Thursday, February 25, 2021
COMPANY,                   )
                           )     (11:06 a.m. to 1:16 p.m.)
              Defendant.   )
_____


MOTION HEARING

BEFORE THE HONORABLE ELAYNA J. YOUCHAH,
UNITED STATES MAGISTRATE JUDGE



**DISCLAIMER**              SEE CERTIFICATION PAGE


**APPEARANCES**:            SEE PAGE 2


Court Reporter:            Recorded; Digital

Courtroom Administrator: E. Garcia

Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988




**Proceedings recorded by electronic sound recording;
transcript produced by transcription service.**

<u>**APPEARANCES**</u>:


For Plaintiff:                MICHAEL S. LEVINE, ESQ.
                              Hunton Andrews Kurth, LLP
                              2200 Pennsylvania Avenue NW
                              Washington, DC 20037

                              CHRISTOPHER CUNIO, ESQ.
                              KATHARINE A. DENNIS, ESQ.
                              Hunton Andrews Kurth, LLP
                              60 State Street
                              Suite 2400
                              Boston, MA 02109

                              RENEE M. FINCH, ESQ.
                              Messner Reeves, LLP
                              8945 W. Russell Road
                              Suite 300
                              Las Vegas, NV 89148

                              BRAD ANTHONY, ESQ.

For Defendant:                MARK J. CONNOT, ESQ.
                              ALEXSA MARINO, ESQ.
                              Fox Rothschild, LLP
                              1980 Festival Plaza Drive
                              Suite 700
                              Las Vegas, NV 89135

                              JOYCE C. WANG, ESQ.
                              COLIN C. MUNRO, ESQ.
                              NANCY STROUT, ESQ.
                              Carlson Calladine & Peterson, LLP
                              353 Sacramento Street
                              16th Floor
                              San Francisco, CA 94111

1       **Las Vegas, Nevada; Thursday, February 25, 2021; 11:06 a.m.**

2                          **Zoom Web Conference**

3                             **Call to Order**

4            **THE COURT:**  Good afternoon, everyone -- or morning.

5            **THE CLERK:**  This is the time set in the Case of

6       2:20-cv-00965-JCM-EJY, *Treasure Island, LLC versus Affiliated*

7       *FM Insurance Company.*

8                  Plaintiff's counsel, please enter your appearance for

9       the record.

10           **MR. LEVINE:**  Good morning, Your Honor.  This is

11      Michael Levine from Hunton Andrews Kurth representing Plaintiff

12      Treasure Island, LLC.

13           **MS. FINCH***:*  And good morning, Your Honor.  This is

14      Renee Finch, we've added by Number 13118, we're co-counsel for

15      Treasure Island, LLC.

16           **MR. CUNIO:**  Good morning, Your Honor.  Chris Cunio,

17      (indisc.) pro hac vice on behalf of Treasure Island, LLC.

18           **MS. DENNIS:**  Good morning, Your Honor, this is

19      Katharine Dennis also with the same firm as Mr. Cunio,

20      Mr. Levine representing Treasure Island.

21           **THE CLERK:**  Defendant's counsel, please enter your

22      appearance for the record.

23           **THE COURT:**  I think Brad Anthony is also representing

24      Plaintiff and we have him -- is Mr. Anthony on the phone?

25           **THE CLERK:**  Mr. Anthony?

4

1          **MR. ANTHONY:**  Hello, good morning, Your Honor, Brad

2   Anthony, I am with Treasure Island, LLC.

3          **THE COURT:**  Thank you.  Now --

4          **MS. WANG:**  Good morning, Your Honor.  Joyce Wang with

5   Carlson, Calladine and Peterson representing Affiliated FM

6   Insurance Company.

7          With me are my colleagues, Colin Munro and Nancy

8   Strout.

9          Also on the Zoom are Mark Connot of Fox Rothschild

10  and Alexsa Marino with Affiliated FM.

11         **THE COURT:**  Thank you, everyone.

12         First, let me ask who will be arguing the Motions on

13  behalf of Plaintiff?

14         **MR. LEVINE:**  Your Honor, Michael Levine.

15         **THE COURT:**  Okay, thank you.

16         And who will be arguing on behalf of the Defendant?

17         **MS. WANG:**  That will be myself, Joyce Wang, although

18  I would ask for the Court's indulgence a little bit because

19  we're not all in the same room, I can't huddle with my team as

20  I might if we were all in court.  There may be a moment, I hope

21  not, but there may be a time where I may have to call on

22  someone else for a piece of information or the like, and I hope

23  the Court -- with the Court's permission, of course, and I

24  would have no problem if the other side needs to do the same.

25         **THE COURT:**  That's just fine, and we do our best to

1   accommodate everyone --

2           **MS. WANG:**  Thank you.

3           **THE COURT:**  -- given these odd times, although it's

4   less expensive, I suppose, everybody's not flying around.

5           I'm going to start with the Motion to Stay Discovery

6   because, of course, that impacts all of the other pending

7   Motions that is filed as ECF Number 44, and I have the Response

8   and the Reply, as well as the -- I believe there's a Surreply,

9   but -- and all of that has been considered by the Court.

10          And let me just start by stating that the Court is

11  very familiar, extremely familiar with the standard for Motions

12  to Stay.  The Federal Rules of Civil Procedure do not provide

13  for automatic or blanket stays of discovery when a potentially

14  dispositive Motion is pending, that's fairly well-settled

15  Federal law in this District and supported throughout the Ninth

16  Circuit.  A dispositive Motion does not warrant a stay

17  automatically.  That can be found in *Twin City Fire Insurance*

18  case which is a Nevada -- District of Nevada case in 1989.

19  There's also *Turner Broadcasting* which is 1997 and (indisc.) --

20  I'm sorry, *Encore Media* which is 2013.  These are just well-

21  settled propositions and, of course, it's the moving party who

22  carries the burden of demonstrating discovery should be stayed.

23          The Court has tremendous discretion in deciding

24  whether to grant a Motion to Stay and will consider and has

25  taken a preliminary peek, I actually read the Motion to Dismiss

6

1    Opposition and Reply.  I read those, these are important issues

2    I know for both parties here, and has also and always does

3    consider Federal Rule of Civil Procedure 1 when making these

4    decisions.

5              Ultimately the Court is guided most strongly by the

6    standard that requires a dispositive Motion to be dispositive

7    of all claims that are pending before the Court, and that the

8    Motion can be decided without discovery.  And here --

9              And, of course, I'm sorry, one more thing, the Court

10   "must be convinced" is the language that is repeatedly used

11   that the Motion -- that the dispositive Motion that is pending

12   will be granted and dispose of the case thereby rendering

13   discovery superfluous and inefficient at best.

14             Here the Court's concern is twofold:

15             One, that the Motion that is pending, the Motion on

16   the pleading, is not dispositive of the whole case.

17             And, two, whether the Court is convinced that the

18   Motion to dismiss will be granted, or whether the Plaintiff's

19   arguments will persuade the Court that there is a basis to

20   allow the breach of contract claim and, therefore, on

21   communicable diseases -- I'm sorry, not on communicable

22   diseases, the other portion of the contamination, excuse me, on

23   contamination, will allow that to go forward to be decided on

24   an issue of fact, and, you know, I am not convinced, but I am

25   open to argument and I will allow the parties to argue.

1          First, you know, insurance policies are inherently

2    complex and can be confusing when initially read.  I'm not sure

3    that that holds true for Treasure Island, a more sophisticated

4    consumer of insurance than the average person would be.  I

5    think it's fairly well-settled that COVID-19 is a virus, I

6    don't think that that's really debatable, but that will be

7    ultimately for Judge Mahan to decide, and that it is also a

8    communicable disease it seems obvious to me, as well, but again

9    something that Judge Mahan will have to decide whether there is

10   any question about those two things.

11          Also in looking at the law it's clear that a policy

12   of insurance can provide coverage under one set of

13   circumstances and deny it on another.  I think that's easy, for

14   example, if somebody is driving intoxicated and is hit by

15   another driver perhaps there are circumstances that will

16   preclude coverage.  There are all sorts of circumstances where

17   coverage may be precluded under one set of facts and not

18   another.

19          Here the policy appears to plainly exclude coverage

20   for contamination and including in this definition is a virus

21   suspected or actual presence, and that the exception for

22   communicable diseases is in essence an exception to the

23   exclusion.  However, all of this is before Judge Mahan, and

24   Plaintiff's argument that there is ambiguity created by the

25   exclusion for viruses, but coverage for communicable diseases

1   is one that Judge Mahan is going to have to decide and decide

2   whether the Defendant's interpretation is the only reasonable

3   interpretation or whether Plaintiff's interpretation is

4   potentially reasonable and, therefore, there is a question of

5   fact.

6           And, obviously, I've thought about all of that and

7   that issue is not before me, but I am not 100 percent

8   convinced, I am not convinced that the Motion to -- on the

9   judgment on the pleadings, essentially the Motion to Dismiss,

10  will be successful.  I am -- find it likely; I find it perhaps

11  substantially likely, but I am not convinced, and I think

12  that's the standard I must meet.

13          There is also the issue on loss of use damage and

14  whether -- and what that means, and whether the loss of use

15  could be covered under these circumstances.  So my preliminary

16  conclusion is that the Motion to Stay Discovery will be denied.

17          Again, Ms. Wang, this is your Motion.  I'm happy to

18  listen to any argument.  I have concerns about the Motion to

19  Compel.  My decision on the Motion to Stay is not a

20  determination that everything sought on the Motions to Compel

21  is going to be granted so don't misunderstand that.

22          Please go ahead, Ms. Wang.

23          **MS. WANG:**  Thank you, Your Honor, and Affiliated FM

24  certainly appreciates the effort that you have clearly put into

25  these issues which are obviously pretty important to the

1  parties, so thank you on behalf of my client and I'm sure

2  Treasure Island appreciates it as well.

3            Certainly we appreciate this, there's no automatic

4  stay.  I'm not sure I did appreciate that I would have to

5  convince the Court to 100 percent of certainty, that's a pretty

6  high standard, so that I'm not sure I realized, you know, was

7  the case.

8            I thought the cases, you know, gave enough room for

9  the Court to accomplish cost and time saving objectives, you

10 know, by permitting or delaying discovery, and I still do think

11 that the Court has broad powers to manage this case.

12           As the Court has pointed out, you know, there are

13 some legal issues obviously teed up in our Motion for Judgment

14 on the pleadings.

15           A lot of the discovery that's at issue in the Motion

16 to Compel -- Motions to Compel pertains admittedly to Treasure

17 Island's claim that AFM acted unreasonably in its positions.

18           I feel 100 percent convinced that that claim will not

19 survive the Motion for Judgment on the pleadings or any other

20 dispositive Motion for that matter.  And perhaps that's the way

21 to look at the issues before us today.

22           As you point out the SARS-CoV-2 is clearly a virus.

23 It is also a communicable disease.  The communicable disease is

24 an exception to the virus exclusion, and the denial of coverage

25 under the part of the policy other than the communicable

1    disease coverage is a position that has been affirmed by over

2    150 courts across the country, at this point there are some 200

3    decisions now.  And I really feel 100 percent that there is no

4    possibility that AFM's decision will be found to be

5    unreasonable, it's just not going to happen, and for that

6    reason I do think that, you know, it's a stay or couched as

7    managing the case it does make sense to postpone, if you will,

8    discovery aimed at the bad faith claim until we have a ruling

9    on the Motion, and maybe just deny it altogether because I

10   don't think it's going to come into play.  It does not make

11   sense for the parties, both parties frankly, to spend thousands

12   of hours or hundreds of hours at least, probably hundreds of

13   thousands of dollars potentially responding to broad discovery

14   concerning whether the position taken in this case is

15   consistent with other positions or things that AFM may have

16   said in the past.  There really is no past, COVID-19 is new,

17   there is no track record, so the notion that there should be

18   discovery so that Treasure Island can assess whether a position

19   taken in this case is inconsistent with other cases is -- I

20   think it doesn't make sense.  So I certainly appreciate that,

21   you know, we're not entitled to an automatic stay and I

22   appreciate the Court's preliminary thoughts about the judgment

23   on the pleadings and that the Court is not 100 percent

24   convinced concerning the question of manageability and so

25   forth.  I do feel that I am certainly 100 percent convinced

1    that the bad faith claim will not survive and that the

2    discovery sought is unduly burdensome and disproportionate in

3    light of the fact that that claim is likely to fail.

4            **THE COURT:**  Thank you, I appreciate the comments.

5            Mr. Levine?

6            **MR. LEVINE:**  Thank you, Your Honor, and I'll be very

7    brief.  I'm going to to try to not snatch defeat from the jaws

8    of victory but there are a couple of points that are worth

9    noting.

10           Your Honor, if -- Counsel for AFM mentioned 150-some

11   odd decisions that Counsel believes are in AFM's favor, and

12   that's simply not the case.  In fact, if the score really

13   mattered the score would be tied, it would be zero zero because

14   there have been absolutely no decisions under the AFM policy

15   and the very issues and problems with that policy (indisc.).

16           The only pertinent decision that the Court should

17   even look at is that (indisc.) decisions (indisc.) and that

18   (indisc.) decision decided by Judge Denton, and Judge Denton

19   very clearly said that our (indisc.) is virtually identical to

20   those (indisc.) in this case state a positive claim for

21   physical loss under that same operative theory that's in the

22   (indisc.) policy.

23           Judge Denton also rejected the insurer's application

24   of a "virus exclusion" in that policy which also is more akin

25   to a traditional environmental (indisc.) that AFM asserts here.

12

1  So to the extent the Court is inclined to look at any other

2  decisions from other courts on (indisc.) business (indisc.)

3  you're looking at further than Judge Denton's decision from

4  Clark County.

5          A second point, Your Honor, concerns the fact that

6  our claim (indisc.) a number of times.  As Your Honor is, I'm

7  sure, aware, Treasure Island has made causes of action citing

8  both in common and bad faith, (indisc.) bad faith, also under

9  the Nevada (indisc.) statute 686 (indisc.) which (indisc.)

10 disease primarily for the bad faith and improper (indisc.) by

11 AFM, and that statute is (indisc.) because it does not require

12 a finding of evidence in fact, relies in primary causes of

13 action with (indisc.) where there has not even been a denial of

14 (indisc.) in some basis, so I think it's incorrect to assume

15 that even if the Motion for Partial Judgment (indisc.) to

16 resolve the issues of (indisc.) possible that the Treasure

17 Island claim under (indisc.) law.

18          And, again, Your Honor, the last point that I want to

19 emphasize, and I did emphasize this quite strenuously in our

20 briefing is that the dispositive Motion, even if it's

21 successful, does not resolve the other Motions in this case.

22 It's not -- (indisc.) dispositive, it wasn't brought to

23 (indisc.) dispositive, and it cannot be (indisc.) while it does

24 address certain issues under the assertions of the insurance

25 policy it makes no argument and does not relate to coverages

1   under the (indisc.) communicable disease (indisc.) coverage,

2   and communicable disease interruption coverage and the

3   (indisc.) tied to AFM's failure to pay or adjust or investigate

4   those coverages.

5           **THE COURT:**  Thank you, Mr. Levine.

6           The Court knows as to the extent I used the phrase

7   "100 percent," that may be poor wording, but the wording does

8   require -- the law does require that I be convinced, and that

9   word, the word "convinced" and the Court takes that to mean

10  certainty, "convinced" means certainty, and I, again, while I

11  am of the opinion that it is likely and perhaps substantially

12  likely that the Court will grant a portion or all of the Motion

13  on the pleading that is pending I am not convinced of that

14  sufficiently to grant a wholesale stay of discovery in this

15  case.

16          The Court does note that I have extremely broad

17  discretion here and I will apply that discretion to the Motions

18  to Compel because they do agree that some of those requests are

19  overbroad, vague and seek information that is not proportional

20  at least at this time to the needs of the case, so I think the

21  place for me to best exercise that discretion is through the

22  Motions to Compel and limiting appropriately that those -- the

23  discovery in that regard.

24          So the Motion to Stay Discovery, ECF Number 44, is

25  denied, it is denied without prejudice.  If something should

1   change before the Motion for Judgment on the pleading is

2   decided, I'm not precluding you from bringing it again, but I

3   would caution that there would have to be some significant

4   change to do so.

5           So I'm turning now to the first Motion to Compel

6   because that is the one that has the most issues, and I want to

7   start by looking at the issues that I think are largely, if not

8   completely resolved which was Request for Production -- so this

9   is ECF Number 40, and it is the Treasure Island's first Motion

10  to Compel, and I'm looking first, Mr. Levine, at Numbers 14,

11  which is the claims file, and 10 the underwriting file, and 4,

12  the talking points piece.

13          I will state as an initial matter that to the extent

14  anything that has been produced or --

15          Let me say this, for any of the Requests for

16  Production where documents are produced or are ordered to be

17  produced, to the extent there is anything withheld on the claim

18  of privilege a privilege log must be produced, and that has to

19  be done promptly, that is just required by the Rules of Civil

20  Procedure, it's not a court-required prospect, and I am

21  ordering Defendants to do that.

22          Second, to the extent that Plaintiff's Motion changes

23  or expands the Requests for Production, those are denied

24  because what's being considered are the Requests for

25  Production, not the revamped requests which are different in

1   some respects than what is actually stated in the Requests.

2   But, again, looking at the claims file, Mr. Levine, the

3   Plaintiffs say that has been produced, and looking at the

4   underwriting file it says that it has -- the Defendant says it

5   has been produced.

6          The fact that the Defendants say there's only one

7   underwriter, unless there is some evidence that Defendants are

8   misrepresenting that fact the Court has no basis to conclude

9   otherwise.  I presume and accept that all parties are acting in

10  good faith, and that no party will bring a known

11  misrepresentation of fact before the Court.

12         So do you wish to be heard on Request Number 14 --

13  I'm sorry, yes, 14 and 10, Mr. Levine?

14         **MR. LEVINE:**  Yes, Your Honor, I do.  And thank you

15  very much for your explanation of the Court's view, not only

16  (indisc.) discovery, but as to the -- on the issues in the

17  structure within which we have been operating and your points,

18  Your Honor, are well-taken.

19         Let me start first with the claim file.  Excuse me,

20  the claim file, Your Honor, is known at AFM as a statutory

21  claim file and we learned this during depositions we have taken

22  over the last several weeks of individuals at AFM including its

23  corporate representatives concerning, among other things, the

24  claim file.  And our understanding now is that the statutory

25  claim file is a rather limited and (indisc.) file.  It is not

1   an all-encompassing claim file, it does not include all

2   correspondence with the (indisc.) concerning the claim or the

3   claim handler.  In fact, what that file consists of are

4   documents that are specifically (indisc.) by the adjuster, it

5   includes (indisc.).  But what we also now understand there's

6   some testimony from AFM is that there are nuance, that there

7   are documents (indisc.) that there are draft documents

8   (indisc.), and a number of other categories of information that

9   are not in the statutory frame (indisc.).  And in making our

10  request for the claim file we were very specific to ask not

11  only for the "claim file," but also claim-related documents

12  that are not in the claim file because at the time the requests

13  were propounded Treasure Island did not know what the claim

14  file system had been used, how it was in that file, what may or

15  may not be in the file.  We didn't know -- the lawyers know

16  from having read the pleadings issues (indisc.) something was

17  different, and some parts of these had really robust claim

18  files and others, as appears to be the case (indisc.) rather

19  limited claim files that require reading of the tabs or

20  insertion of documents into that claim file.  That's what we

21  have learned through the discovery, and it does not give us

22  pause (indisc.) in fact (indisc.) compelling discovery here

23  because the witnesses testified and the documents in the file

24  demonstrate very limited information is in that file.  Again,

25  we heard from this adjuster, David Carroll (phonetic) that he

1   has the documents from his hard drive.

2           We learned from Mr. Carroll and the corporate

3   representative Brian Bush (phonetic) that emails are sent

4   between the first adjuster and the energy adjusters including

5   the highest level, Mr. Cook, that would not be in the claim

6   file and in fact we have seen no communications between

7   Mr. Cook and Mr. Carroll in that claim file that we note in his

8   testimony that he was involved and had oversight over this

9   claim.  So we (indisc.) Your Honor, and believe that there are

10  various repositories and collections of information concerning

11  the claim that one would expect to be in a claim file that do

12  not exist in the claim file, and those documents should be

13  produced.

14          If you'd like, Your Honor, we could do a (indisc.) I

15  could speak to (indisc.).

16          **THE COURT:**  Well, just as to the underwriting file.

17          **MR. LEVINE:**  Okay.  As to the underwriting file it is

18  a little bit different from what we (indisc.) of the

19  testimony from Mr. Bush, Brian Bush, who is the underwriter at

20  AFM, that unrelated material exists that has not been produced.

21  We -- the understanding that we have is from Mr. Bush's

22  testimony and the documents that were produced by AFM was that

23  AFM took a very restrictive view of the Corona --

24  (indisc.) the claim file.

25          What was essentially good news was the insurance

1   policy at issue and a preliminary correspondence leading up to

2   the issuance of that policy.

3          What you don't see are drafts of either the policy,

4   we don't see what would appear to be (indisc.)

5   communications on the underwriting submission, the exchange of

6   quotes and binders.  We don't see communications about the

7   policy wording or the changes -- not (indisc.) over time to

8   know from discovery investigations conducted by Treasure Island

9   that would (indisc.) in claim 16 was about the billing period

10  upon Mr. Bush who was the underwriter on this file,

11  underwriting policies for Treasure Island that significant

12  changes were being made to the AFM policy including addition of

13  the communicable disease coverages that had been a portion of

14  the basis of the claim that we're litigating now.  When going

15  through the policy you'll see no communication whatsoever about

16  (indisc.) regarding changes in the policy.  Again (indisc.) no

17  drafts, no redlines, no nothing, frankly, about those critical

18  changes in the policy.

19         We see no communications with the broker about

20  coverage enhancements or coverage changes, and there's nothing

21  to suggest (indisc.) between Brian Bush and his supervisors

22  were ever captured other than if it came to the underwriting of

23  the Treasure Island policy as well.  So in a nutshell we're

24  looking at the underwriting of policy coverage by Mr. Bush in

25  2009, that is (indisc.) period.  We received very limited

1  information alluding to that relationship and, again, no

2  information whatsoever concerning critical changes that

3  occurred in the policy at the time.

4        **THE COURT:**  Thank you.

5        Okay, Ms. Wang, before I give you an opportunity to

6  respond, your Request Number 14 says "your entire claim file."

7        And then 10 says "your entire underwriting file.  So

8  it sounds like they gave you what they identify as the file.

9        What you want is things that are outside the file.

10  You ask in a separate Request for Production for "all drafts of

11  the policy that is in effect" to which Defendants have said

12  there are none; that's Request Number 9.  It says "all drafts

13  of the policy including any terms, definitions, provisions,

14  exclusions or endorsements of the policy."  And that's where

15  drafts presumably would be produced although Defendant says

16  there are none.

17        And I don't -- let me see if there's any requests --

18  I don't see in this set any specific requests for internal

19  communications or communications with the broker, and if AFM

20  doesn't define the claims file as including that stuff then I

21  don't know that they have failed to do what you asked.  Maybe

22  the request isn't as broad as you thought, but that's not

23  unusual in litigation that sometimes we have to make a second

24  set of requests.

25        Now I may ask Defendants if they're willing to

1   produce those without going through that process, but if you

2   want to respond to that before I ask Ms. Wang to respond

3   generally I'm happy to listen.

4           **MR. LEVINE:**   I do, Your Honor, thank you.  And just

5   to be clear we're talking about the claim file, not the

6   underwriting file.

7           **THE COURT:**   Well, you have talked about core

8   communications for both, brokerage communication, that was

9   stated in the underwriting file.

10          For the claims file you have talked about

11   communications that Mr. Carroll had on his hard drive, and then

12   specifically you identified communications between Carroll and

13   Cook which are not included.

14          You also mentioned for the claims filed, draft

15   documents, underwriting file drafts of the policy, exchanges of

16   quotes.  I don't write down everything.  So my point is, if

17   these things are not in the claims file or the underwriting

18   file, then it's not that Defendant has failed to produce what

19   you requested but your expectation of what would be there is

20   different than what they do which is what you're saying.  I

21   recognize that.

22          **MR. LEVINE:**   Well, it -- yeah.

23          **THE COURT:**   Go ahead.

24          **MR. LEVINE:**   Your Honor, and if I may respond.  In --

25   within -- I'll respond with respect to both underwriting and

1 claims.  First on underwriting, Request for Production Number 9

2 asks for all drafts of the policy including any terms,

3 definitions, provisions, exclusions and endorsements to the

4 policy.  Request 10 then asks for the entire underwriting file.

5 And Request 11 asks for all documents concerning the drafting,

6 underwriting or issuance of the policy that are not contained

7 in your underwriting file.  12 then follows up on your request

8 as does 14.  12 is specifically for all documents concerning

9 the drafting, underwriting or issuance of any property policies

10 issued by AFM to Treasure Island other than the policy.

11         So I think, Your Honor, Treasure Island did very

12 clearly ask both with respect to the policy of even the 2019-

13 2020 policy and the other policies that were issued by AFM to

14 Treasure Island.  Not alone was the policy itself but those

15 documents concern -- the policy would not be the concern, the

16 underwriting, drafting and modification or issuance of the

17 policy.

18         **THE COURT:**  All right.  So Request for Production 11,

19 12 and 13 aren't part of your motion.  Perhaps that's because

20 you didn't have the information in order to include that in the

21 motion because the depositions were taken after.  I don't know

22 but the Court did not consider whether there was a failure to

23 produce under 11, 12 or 13 because those aren't before me.

24 Now, I'm not unwilling to talk about those with Defendant but

25 that's different than arguing that 14 and 10 were not responded

1   to.

2          And I did mention Number 9 which is something that we

3   can get to.  You did not put these in your motion in numerical

4   order, Mr. Levine.  I am dealing with them in the order in

5   which they are in the motion.  So 9 comes after many others are

6   to be considered.  We can throw in 9 now because Defendant says

7   there are none and you are telling me that you have documents

8   in your possession already that indicate there are drafts,

9   Mr. Levine?

10          **MR. LEVINE:**  Yes, Your Honor, we do.  We were able to

11   obtain from the website of the New York Department of Insurance

12   draft submissions of the policy, in fact, in redline by AFM

13   that did use and they sought regulatory approval from the State

14   of New York.  So we know that at least some drafts did this.

15          **THE COURT:**  Well, drafts submitted to the State of

16   New York or drafts submitted to the State of Nevada?

17          **MR. LEVINE:**  Your Honor, it's the same policy.  We

18   don't know what, if anything, has been submitted to Nevada but

19   we know it's the same provision policy with the same changes

20   that do appear in the policy that was ultimately sold to

21   Treasure Island.

22          **THE COURT:**  It's an identical policy?

23          **MR. LEVINE:**  It's a standard form, Your Honor.

24          **THE COURT:**  Standard form.  Okay.

25          Ms. Wang, why don't you address Requests for

1   Production 9, 10 and 14.  I say them in numerical order but you

2   can address them in any order you'd like.

3          **MS. WANG:**  Sure, thank you.  Starting with the claim

4   file which I think is -- I'm not sure which request number it

5   is.  It's Item 2 in the motion.  So --

6          **THE COURT:**  It's Number 14, your entire --

7          **MS. WANG:**  Thank you.

8          **THE COURT:**  -- claim file for the -- your entire

9   claim file for the claim and the claim is capitalized meaning

10  Treasure Island's claim.

11         **MS. WANG:**  Right.  So Your Honor hit the nail on the

12  head.  The claim file, of course, has been produced and I guess

13  I would just by way of background say that this was not an

14  extensive claim file because Treasure Island actually did not

15  provide information showing actual presence of these four

16  physical damages.  So there's four or five letters between the

17  parties and a handful of emails and then suit was filed.  So

18  it's not an extensive file.

19         In addition, while it's true that the adjustor is

20  responsible for putting documents into the electronic file, it

21  is a formal file documenting Treasure Island's claim.  So

22  unlike folders that I create on my computer and I might forget

23  to put something in a folder, the claim handlers and

24  supervisors are trained to make sure that all documents get

25  into the claim file.

1          So searching for documents relating to the claim

2     which, as you point out, are not part of the request is not

3     going to yield anything.  The testimony of three Affiliated FM

4     witnesses consistent that the first adjustor, Mr. Carroll, was

5     the point person for all communications.  So everyone else who

6     was supervising or involved in the claim -- everything would be

7     provided through David Carroll's production and we did produce

8     -- we searched Mr. Carroll's computer and produced all of this

9     documents.

10          So it's been produced and we also did provide a

11    privilege log and there may be communications between

12    Mr. Carroll and Mr. Cook that are on the privilege log because

13    they also include an attorney.  So, of course, those were not

14    produced.  So I don't really have much else to say about that.

15    The searches of other people who may have been involved in the

16    claim are not going to yield any additional documents that are

17    not already in the claim file and so that discovery would be

18    disproportionate to the probative value of what it might yield.

19          Turning to the underwriting file, I guess I would

20    start by saying, I'm not even sure it's relevant to whether

21    Affiliated FM properly applied the policy terms to Treasure

22    Island's claim.  But that aside, we did produce the entire

23    underwriting file including all of Affiliated FM's engineering

24    and inspection reports from 2009 to the present.  That's a span

25    of 11 years.  Brian Bush testified he was the underwriter and

1   we also produced his entire file and hard-copy documents that

2   he happened to have.  So all of that has been produced.

3          Any other documents "relating to underwriting" is

4   really a fishing expedition.  Based on Mr. Bush's testimony,

5   there are no such documents and as Your Honor pointed out, that

6   request is not properly before the Court on this motion.

7          Regarding drafts of the policy, the request is for

8   drafts of the Policy (capital P) which means Treasure Island's

9   policy.  And to that request, there are no drafts of Treasure

10  Island's policy.  There may be prior versions of the form but

11  that's not what the request sought and is not properly the

12  subject of this motion.

13         Mr. Levine mentioned a redline, I think, of a form

14  submitted to the State of New York.  I'm not -- I don't know

15  what -- that was not requested.  I don't know what that is.

16  It's -- I don't know if it's the same form.  It's certainly not

17  Treasure Island's policy.  I can tell you that.  And there are

18  no redlines of Treasure Island's policy and any prior versions

19  of the form would not be in the underwriting file in any event.

20         I'd also add that extrinsic -- I mean, to the extent

21  that drafts or documents relating to underwriting are pertinent

22  as extrinsic evidence of the intent of the policy, discovery on

23  that point is premature because there's been no finding of

24  ambiguity and that issue is squarely before Judge Mahan, as

25  Your Honor has pointed out.

1          And there is authority cited -- the *Lapan* (phonetic)

2     case cited in the *Ramagada* (phonetic) case which is cited in

3     our papers -- talks about that, extrinsic evidence being

4     premature until there's a finding of ambiguity.  So to the

5     extent that we're fishing for drafts or prior versions of the

6     policy, that discovery is also premature.

7          **MR. LEVINE:**  Your Honor, if I may respond?

8          **THE COURT:**  Yeah, Mr. Levine, before you respond, a

9     couple of, I think, hard points sometimes to hear.  I tell

10    people all the time the law is about splitting hairs and that's

11    what lawyers do, right?  You don't want to do it in a way that

12    creates a lawyer -- not you.  A lawyer does not want to do it

13    in a way that creates unnecessary work or argument although

14    some lawyers do that.  I understand that and Courts and I get

15    frustrated with that.

16         But in looking -- I'm now looking at Request Number

17    11 and you do ask for documents concerning the drafting,

18    underwriting or issuance of the policy defined as the policy

19    issued to Treasure Island, not to the form of the policy.  And

20    I'm not sure that the form of the policy is something the Court

21    would grant anyway but I would have to consider that on both

22    sides.

23         And Request Number 12 is all documents concerning

24    underwriting -- concerning the drafting, underwriting or

25    issuance of any property policies issued to AFM -- excuse me --

1   issued by AFM to Treasure Island other than the policy.

2           And 13 is underwriting manuals instructions which is

3   a different subject matter.  So I'm not going to reach that.

4           So to the extent that you're asking about the policy,

5   I am going to -- I do -- not I'm going to.  I do accept AFM's

6   representation that there simply isn't anything that they

7   haven't produced.  That they submitted something to the State

8   of New York is true.  I take your word for that as well but

9   that's not a draft of the policy that was issued to Treasure

10  Island and I think that going that far afield at this juncture

11  is where the Court can exercise its discretion to say -- and as

12  to other requests that we'll get to -- issues that relate to

13  policies or decisions about policies other than AFM's policies

14  is premature.  That is where we get too far afield.

15          Now, there are some things that I have questions

16  about with respect to your request that I am not convinced have

17  been fully responded to.  I was unaware that there was a

18  privilege log because the representation was that there was

19  none but perhaps it was produced afterwards.  But I don't see

20  that there -- based on what Ms. Wang is telling me that there

21  is anything to produce with respect to 9, 10 and 14 that have

22  not been produced given Mr. Carroll's -- and I saw this in the

23  opposition.  Mr. Carroll's hard drive was searched and many

24  documents were produced.

25          To the extent there are communications between he and

1   Mr. Cook that are privileged and on the log that you question,

2   you can certainly do that but I just don't see where there

3   hasn't been the production that you have asked for.  So please

4   go ahead.

5           **MR. LEVINE:**  Thank you, Your Honor.  And I do want to

6   respond on the underwriting.  I don't think I've yet addressed

7   the basis for the claim documents which was Request 14.  So

8   focusing first on the underwriting, Your Honor, the first

9   point, the *Ramagada* decision that counsel referred the Court to

10  simply doesn't support AFM's position and, in fact, that case

11  dealt with the production of (indisc.) and said would include

12  generally the instructions, claim manuals and policies,

13  procedures and guidelines as well.

14          More on point is the decision by Magistrate Cobb in

15  the *National* (indisc.) because that case involved and

16  ultimately Magistrate Cobb ordered the production of

17  underwriting and interpreting documents which he found to be

18  relevant and discoverable in breach of contract cases.  We --

19          **THE COURT:**  I haven't gotten to those yet.  So that's

20  a different request, right?  That's not the claims file or the

21  underwriting file.  You have a different request for guidelines

22  and manuals and provisions pertaining to underwriting and I

23  haven't gotten to those yet.  So I don't want to confuse them.

24  I'm just talking about 9, 10 and 14 right now.

25          **MR. LEVINE:**  I apologize, Your Honor.  I thought I

1   was responding to a point that Ms. Wang made.

2           With respect to Request 9 and others, I want to first

3   make a point to the motion to compel.  (indisc.) which

4   (indisc.) with Request Number 10 but also includes Request for

5   Productions through 11 and 12 in Footnote 8 and has been listed

6   in the (indisc.) of the motion.  As Your Honor pointed out,

7   Request 9 also was in the motion in another section.

8           But these requests, Your Honor, they do clearly speak

9   not only to the policy but to the terms, definitions,

10  provisions and exclusions that are included in the policy.  And

11  that, Your Honor, would include the form, the preadmission form

12  which is the largest component of the policy but nevertheless

13  the terms and conditions of the policy and that are in the

14  policy.  And it's not the only form.  There's drafts of that

15  form that the facts related to state regulations.

16          Again, we know that only because certain conditions

17  are available online but we don't know what has been submitted

18  also.  And the only reason I emphasize that discovery, Your

19  Honor, is that we know from what was said to the New York

20  Insurance Department that representations and admissions were

21  made, that statements were made that ultimately demonstrate the

22  intent and the purpose behind the (indisc.) of the policy.

23  And, frankly, if those statements and admissions that AFM

24  suggest proof does not want to be brought to light in this case

25  and we understand their reason for not doing this.

1          And I would respectfully request, Your Honor, to look

2   closely at the requests and understand that it's not just about

3   policy.  Again, these are the semantics that AFM is hiding

4   behind.  It's not just the policy.  If it were, it would be a

5   very simple, simple request, the policy.  But we ask for much

6   more.  We ask for much more in a number of requests that work

7   around the policy.

8          And to Your Honor's point from earlier, the request

9   would ask the way we were because we didn't know at the time.

10  We didn't know how the information was kept -- where it was

11  kept in or what it was kept in.  So we had no choice but to

12  present the request the way we did but I do believe that they

13  encompass not just the policy but also the forms and any other

14  provisions that are incorporated into that policy by handlers.

15  That's what handling does, polls from different places and

16  compiles a policy using, among other things, the provision form

17  (indisc.) submitted in draft in redline to at least one other

18  state regulator.

19         Your Honor, if I may also separately address the

20  clean file because I want to make sure that that does not get

21  included with the underwriting file.  The request for the claim

22  file which is primarily a request for a claim that ultimately

23  includes other requests including 1 through 3, 15, 19 through

24  21 and 46 as I alluded in the motion to compel Number 7.  It

25  includes much more than the statutory claim file and much more

1    than the hard drive of David Carroll.

2            We ask specifically not only for the -- again, going

3    through the semantics to define claim file but any documents

4    relating to the claim that were not be in the claim file.

5            So, Your Honor, from Treasure Island's perspective --

6    and we do put emphasis on a reasonable perspective but if we

7    ask for the claim file and/or documents concerning the claims

8    that are not in the claim file, then these two requests will

9    encompass any communications, any documents that concern a

10   claim and how the (indisc.) will resolve -- reside, whether

11   it's in the claim file, Mr. Carroll's hard drive or in the

12   Outlook folders of each of the other custodians that we've

13   identified who were admittedly by AFM and by -- in Treasure

14   Island's name.  That includes Brian Cook.  That includes Jason

15   Wayne (phonetic).  It includes Mr. Casillas (phonetic) and

16   Maxine Walker (phonetic) and we believe also Robert Dinoli

17   (phonetic) and Alexsa Marino and Joe Balkas (phonetic) and John

18   Bakey (phonetic).  There are a number of other people

19   (indisc.).

20           Those documents do not appear anywhere in the claim

21   file that was produced but we know they've had involvement in

22   the direct handling of (indisc.) claim or the handling of

23   COVID-19 claims generally including the Treasure Island claim.

24           **THE COURT:**  Mr. Levine, Request Number 14 says, your

25   entire claim for the claims -- I'm sorry -- your entire claim

1    file for the claim.  Request Number 10 says your entire

2    underwriting file for the policy.  Request Number 9 says, "All

3    drafts of the policy including any terms, definitions,

4    provisions, exclusions or endorsements of the policy."

5            Requests 11, 12, 13, 3 and others were not briefed.

6    They were not presented to the Court.  Yes, they are in

7    footnotes.  It says, "See RFPs" and it refers to various

8    numbers but you do not contend anywhere in your motion that

9    there's been a failure to respond to those.  You don't even

10   contend that in your second motion.  The Court has not focused

11   on those.

12           In addition, Request Number 3 says, "All documents

13   concerning communications with Treasure Island."  So that says

14   to me, you want all communications with Treasure Island but all

15   documents concerning communications with Treasure Island and I

16   don't have any information nor has Ms. Wang had an opportunity

17   to respond to whether or not the AFM has produced all documents

18   concerning communications.

19           So I'm not prepared to rule on that.  I don't know if

20   all documents concerning communications with Treasure Island

21   have or have not been produced but that hasn't been briefed and

22   while I really don't want to send you all back to do another

23   set of motions because that's expensive and time-consuming, I

24   don't even know that you've met and conferred over Request

25   Number 3.  I don't know what her response would be.

33

1          And with request to Numbers 11 and 12 -- and I'm not

2     reaching 13 right now because that is a different subject

3     matter and I am separating them on purpose so that this

4     transcript is clear.  We are talking about a claim -- claims

5     file and underwriting file and I understand the distinction.

6          So Request Number 12 asks documents concerning the

7     drafting, underwriting or issuance of the Policy (capital P)

8     that are not contained in the underwriting file.  And Request

9     Number 12 says -- if I didn't say that was Request Number 11,

10    that was Request Number 11.  Request Number 12 is all documents

11    concerning the drafting, underwriting or issuance of any

12    property policies issued to AF -- issued by AFM -- I said --

13    made that same mistake previously -- to Treasure Island other

14    than the policy.  Those two are not before me but I don't have

15    any information that those documents have not been produced.

16          I understand your issue with the submission to New

17    York.  That's not before me either.  What is, is Request Number

18    9, all drafts of the Policy (capital P) and if I am a lawyer --

19    and I am -- if I am a lawyer for AFM, the policy has a

20    definition.  The terms, definitions, provisions or exclusions

21    or endorsements to the Policy (again capital P), I will produce

22    the drafts of this policy or drafts of the terms, definitions,

23    provisions, exclusions or endorsements to this policy.

24          If, for example, AFM issued a policy in New York and

25    made changes to that policy pursuant to that Department of

34

1   Insurance's determinations, that's not this policy.  It's just

2   not.  And I understand you ask narrowly.  You got documents.

3   You didn't get everything.  That's not unusual in commercial

4   litigation.  There may need to be a second set but those issues

5   aren't before me and I just don't have anything that suggests

6   9, 10 and 14 have not been responded to.

7          Now, that's -- with respect to Request Number 4 and

8   the talking points -- and I'm moving on because your motion to

9   compel with respect to Requests for Production 9, 10 and 14 is

10  denied.

11         With respect to Number 4, the talking points, I

12  understand your concern.  I understand that you believe that

13  the company had made a decision -- the company -- the insurer

14  had made the decision before the claim may have ever been made

15  by Treasure Island not to pay out claims based on COVID-19 but

16  they contend -- that is, I should say "it."  The Defendant

17  contends that the talking points other than what they've

18  produced are privileged documents.

19         Have you received a privilege log with respect to

20  those documents pertaining to the talking points, Mr. Levine?

21         **MR. LEVINE:**  Your Honor, I don't believe we have and

22  the reason I say that is we now understand when the talking

23  points were created and I don't believe we have a privilege log

24  that covers that time period.

25         **THE COURT:**  Okay.  So, Ms. Wang, have -- do you

1   believe or know, sitting here today, whether AFM has produced

2   or Affiliated Insurance Company has produced a thorough

3   privilege log that would be responsive to Request Number 4?

4   And Request Number 4 -- where is Request Number 4?  You know

5   what?  I have it right here.  Give me one second.

6        Request Number 4 states, "All documents concerning

7   the document attached as Exhibit H to the complaint" and that

8   -- those are the talking points.

9        **MS. WANG:**  Right.  So the short answer to your

10  question is that privileged documents are not on any log at

11  this time.  The log was produced in (indisc.) 2020.  The

12  request is for all documents concerning the talking points and

13  that is overly broad and I question, of course, whether the

14  talking points are relevant at all because as the testimony of

15  Mr. Carroll and Mr. Cook has shown, Treasure Island did not

16  provide information as to actual presence or physical damage

17  and, therefore, coverage under the communicable disease portion

18  of the policy, which is what the talking points address, has

19  not even been evaluated at this time.

20        And so -- and Mr. Carroll also testified he has not

21  relied on the talking points with Treasure Island's claim

22  because of that.  So they haven't even come into play.  That

23  said, clearly counsel has obtained them because they're

24  attached to the complaint and in the spirit of disclosure and

25  cooperation, we did provide the two known versions of the

1    talking points and the distribution emails, meaning the emails

2    whereby the talking points were distributed to senior adjustors

3    within AFM.

4           Documents concerning the talking points is a much

5    wider swath of documents and could conceivably try to seek --

6    well, if the talking points were distributed to the senior

7    adjustors and the senior adjustors -- the testimony is --

8    educated their field teams on the talking points and that the

9    analysis contained in the talking points.  In order to find all

10   documents concerning the talking points conceivably -- I mean,

11   we don't know what all the field adjustors may have -- who may

12   have said what to whom about the talking points.

13          So that request I think is overly broad.  So we would

14   need to narrow that request somehow to even come up with a

15   universe to review for purposes of a privilege log, if that

16   makes sense.

17          **THE COURT:**  Well, a privilege log would only cover

18   communications that were between an attorney and -- whether

19   in-house or outside -- and an individual who's employed by

20   Affiliated or an agent of Affiliated -- and I don't mean

21   "agent" in the sense of insurance agent.  I mean agency agent.

22   And potentially also anything that the -- over which the

23   company -- I'll just call it "Defendant" -- would claim as

24   either a trade secret or proprietary and confidential if there

25   isn't -- and I don't remember if there is a protective order in

1   place.  If there's a protective order in place, those should be

2   produced pursuant to the terms of the protective order.

3           As far as the word "concerning" goes, I think it's

4   pretty common in requests for production for lawyers to say

5   "concerning."  Often they add "relating to" or "arising from."

6   There are all sorts of words we use.  I don't know that the

7   word "concerning" is all that unusual in a request for

8   production.  I do understand, however, Ms. Wang, that given

9   that there may be downline (my word) communications that you

10  would not have any control over necessarily or know about that

11  this could be a rather overwhelming request.

12          So I'm going to turn this back to Mr. Levine and say,

13  I think that there is some production pertaining to the talking

14  points that I'm ready to grant but I understand Ms. Wang's

15  concerns.  Do you have an idea, sitting here, or is there

16  something that you feel you could speak with Ms. Wang about

17  offline and perhaps work out some parameters that might be

18  acceptable to both parties?

19          And, remember, just because you agree to one set of

20  parameters now doesn't mean that you can't expand those should

21  the motion on -- for judgment on the pleadings not be granted

22  and the case progress in the way that you, Plaintiffs, believe

23  it will.

24          **MR. LEVINE:**  Your Honor, yes, and I'll respond to

25  that point.  Yes, I do believe that I can confer with Ms. Wang

1   and her colleagues regarding the request.  And I must say,

2   again, we have learned a lot in discovery since filing the

3   motion to compel and we'd present quite differently today than

4   we did when we filed back in October based on the discovery

5   that we've obtained.

6           And we do know who offered the talking points now and

7   we know who directed that the talking points be (indisc.).  We

8   understand the third party Mr. Cook is involved in that process

9   as well.  So I think we have a very good idea of where most of

10  the communications concerning the talking points now lie.  But

11  there are a couple other issues here and one, Your Honor, does

12  hit on the head and that is the protective order that's in

13  place in this case.  So we do have that and we've had it in

14  place for a while and there should be no issues regarding

15  confidentiality or proprietary work that would inhibit

16  discovery in the case.

17          The talking points, we understand, Judge, were

18  distributed, as Ms. Wang points out, among the adjustors and

19  conversations occurred regarding them but one of the issues --

20  and this is really an overarching failure that Treasure Island

21  perceives in this case and that is that narrowing keywords and

22  a true ESI search was conducted by AFM.  Even though the

23  parties negotiated and agreed to an order -- agreed stipulation

24  and order for the production (indisc.) as the Court entered the

25  order in September -- on September 7th.

1          And that, I believe, has led to the situation we now

2    have not really concerning the talking points but quite -- with

3    all of you topics that are the subject of the motion.  So I'll

4    respectfully ask Your Honor that in addition to ordering the

5    further production of documents concerning the talking points

6    that your order include instructions to abide by the (indisc.)

7    condition order that the Court entered in this case.

8          **THE COURT:**  What I propose to do -- and I'll listen

9    to both of you very briefly -- is to hold Request Number 4 in

10   abeyance, neither grant it nor deny it at this time, allow the

11   parties an opportunity to meet and confer about the scope of

12   that request including, as Mr. Levine has identified, ESI for

13   which there may be appropriate search -- of which there may be

14   appropriate searches regarding talking points.

15         But I think that I need the two of you or your

16   colleagues to confer about the scope of what is going to be

17   requested or searched for or the search terms that may be

18   agreed upon that are reasonable given the status of the case at

19   this time.

20         And I am advising you, Mr. Levine, to think about the

21   status of the case at this time and my perspective on discovery

22   not being wholesale unlimited because there is this pending

23   motion that I think has some merit.  So I'm trying to apply the

24   Rule 1 standard to your request for production, all of which I

25   think may ultimately -- and all of your concerns may ultimately

40

1  be discoverable if you prevail on -- or defeat, I should say,

2  the motion to dismiss, the motion for judgment on the pleadings

3  and/or a portion of it.

4       So Number 4 is neither granted nor denied and held in

5  abeyance and the parties, this is what I would say.  Please,

6  when we are done, do not file another long set of motions.  I'm

7  very familiar now with the subject matter and with some very

8  brief status, I can get back on Zoom with you and do my best to

9  find resolution if you are unable to resolve these.  Anything

10  that is left unresolved today, I can do my best to help you

11  resolve them in a way that makes sense without substantial

12  briefing.

13       So I'm going to move on now to Request Number 6, all

14  claims filed -- claims -- excuse me -- all claims manuals,

15  policies and/or guidelines concerning AFM's property insurance

16  policies including but not limited to AFM's Global Advantage or

17  AFM provision form property insurance policies.  And what I

18  understand is that the Defendants take the position that they

19  have produced all applicable sections of all policies and

20  manuals.  Defendant -- Plaintiff says, rather, that 35 pages

21  have been produced.  No index, no table of contents but of

22  greater interest to the Court even than those two is that in

23  those 35 pages, there are hyperlinks to other documents and

24  other sections are referenced and those have not been produced.

25       So let me ask you, Ms. Wang, first, with respect to

41

1   the hyperlinks or other sections of manuals that are referenced

2   in the 35 pages that have been produced by Defendant, why those

3   hyperlinks -- the sections referenced essentially -- the

4   information referenced in those 35 pages should not be

5   produced?

6         **MS. WANG:**  Well, unfortunately, as I sit here, I

7   don't know what all the hyperlinks are.  I suspect they weren't

8   produced because partially oversight, but also the information

9   may be available publicly.  But I don't know that.

10        **THE COURT:**  Fair enough.

11        **MS. WANG:**  Yeah.  So I'm certainly willing to revisit

12  production of whatever is in the hyperlinks.

13        **THE COURT:**  And other sections.  Because, you know,

14  I'll make up a number.

15        If you're in Section 15, and Section 15 refers to

16  Section 22, Section 22 would appear to have some relevance to

17  15, and 22 should be produced.

18        **MS. WANG:**  Right.

19        **THE COURT:**  If it's a 400-page manual and there's 30

20  pages that are relevant to 15, I can see that those 30 pages

21  should be produced.

22        But in any event, those two things seem quite obvious

23  to me, given your willingness to produce the 35 pages.

24        My other question is, are you willing to produce an

25  index or, to end -- or a table of contents so that Plaintiffs

1   may be able to access what other sections they believe -- which

2   you can argue about obviously -- would be relevant to their

3   claims?

4           **MS. WANG:**  We would, Your Honor.

5           **THE COURT:**  Okay.  So Six is granted to this extent

6   that the index and table of contents shall be produced as well

7   as the relevant sections of any hyperlinks or other sections

8   referenced in the 35 pages that have been -- already been

9   produced by Defendants.

10          Now, with that order, Mr. Levine, do you wish to be

11  heard further on Number Six?

12          **MR. LEVINE:**  Your Honor, I assume that (audio glitch)

13  production of the index and table of contents and other

14  portions of the manual, the length or for reference, that

15  Treasure Island would not be precluded from following up on

16  those sections (audio glitch) that we feel additionally to --

17  should be produced.

18          And I ask that because it's difficult to speculate

19  what may be there.  You know, we had some testimony.  It's my

20  understanding that there are sections that pertain to (audio

21  glitch) authority and escalation of concerns or problems and

22  things along that -- those lines that we frankly just don't

23  know what does or doesn't actually exist.

24          So we will, I guess, want to revisit this (audio

25  glitch) previously additional production.

43

1          **THE COURT:**  And that you are not precluded.  The

2    grant is not with prejudice.  In other words, you may come back

3    and seek more as appropriate.  I would encourage you all to

4    speak with each other and do your best to resolve any issues

5    before you bring them to me.

6          But, yes, you -- the answer to your question is, you

7    are correct, you are not precluded.

8          So Number Six is granted to the extent stated.

9          Number 13, "All underwriting manuals, instructions,

10   and/or guidelines in force during the period, January 1, 2018

11   and the present, that are applicable to the underwriting of the

12   policy."

13         And to this, what I have written down is that there

14   are no underwriting requirements for contamination -- for the

15   contamination exclusion, which I accept but find surprising.

16         I'm not sure if there are no underwriting

17   requirements for communicable disease coverage, Ms. Wang.  Is

18   that correct?  Do I remember that correctly?

19         **MS. WANG:**  That is correct, there are none.

20         **THE COURT:**  Give me one second.  I'm looking at a

21   particular page.  Okay.

22         Mr. Levine, what is your response to that -- to that

23   representation?

24         **MR. LEVINE:**  I guess, again, I'm responding in the

25   absence of information, which is always tricky.

44

1          But I think our position, at a minimum, Your Honor,

2    is that there are no sections that Counsel represents in --

3    that is include a doubt Ms. Wang is representing, based on what

4    she understands.

5          But if there are, in fact, merely sections, then, at

6    a minimum, AFM should be required to present a custodial

7    witness who is not doing the underwriting manuals and the

8    guidelines that concern underwriting who can testify as to what

9    the company actually has and does not have.

10         **THE COURT:**  Well, you can certainly set that

11   deposition.  That's not in your request for production.  And I

12   understand why you'd want that testimony.  But I don't think

13   that's before me right now.

14         And I understand why you -- you find that surprising.

15   I don't find surprising that there isn't a great track record

16   on COVID-19.  Because, in modern history, there has been

17   nothing similar to that.

18         I mean, probably the last epidemic of any kind was

19   polio, and that was a long time ago, and, before that, the

20   Spanish flu.  And I don't know that anything pertained to

21   either one of those events would be relevant to this.

22         **MR. LEVINE:**  But, Your Honor, if I may.

23         **THE COURT:**  Yeah.

24         **MR. LEVINE:**  Actually, we (audio glitch).  It goes to

25   the world of insurance, and more specifically, property

1   insurance.  Because there have been -- I guess, call them

2   epidemics if you will, but certainly more amounts of claims

3   over the recent years for SARS 1 or H1N1 or Ebola or other --

4           **THE COURT:**  Right.

5           **MR. LEVINE:**  -- communicable --

6           **THE COURT:**  Ebola never hit the United States.  And

7   what AFM or any property did -- any insurer did in Africa to

8   deal with Ebola would -- is not relevant at this time.

9           With respect to H1N1 --

10          **MR. LEVINE:**  They are (audio glitch).

11          **THE COURT:**  -- and SARS, they were very small.  There

12  was nothing -- it was nothing like COVID in the United States.

13          **MR. LEVINE:**  Your Honor --

14          **THE COURT:**  In the United States.

15          **MR. LEVINE:**  If I may?

16          **THE COURT:**  Yeah.

17          **MR. LEVINE:**  And I apologize for interrupting.

18  However, it was SARS (audio glitch) uprooting the insurance

19  industry to present the other cases as the insurance service

20  offices or (audio glitch) virus exclusion, as well as with the

21  communicable disease coverage that is given in the AFM policy.

22  And that was back (audio glitch).

23          **THE COURT:**  You know, there is generally some

24  precipitating event that results in insurers excluding some

25  kind of coverage.

1          So I don't doubt --

2          **MR. LEVINE:**  (Audio glitch).

3          **THE COURT:**  I don't doubt that.  I just don't know

4     that, at this juncture, what happened with SARS or H1N1 really

5     is proportional to the wording in your -- in the policy at

6     issue.  Because that was a long time ago.

7          I don't find the wording terribly confusing.  But I'm

8     willing to let Judge Mahan make that decision as to whether

9     there's any ambiguity.

10          But what I will say --

11          **MR. LEVINE:**  Your Honor --

12          **THE COURT:**  One second.  What I would say,

13     Mr. Levine, is that you are going to get an index and table of

14     contents of the underwriting manuals as a result of Number 6.

15          And so if there is something that you find that you

16     believe is relevant and responsive to Number 13, you are not

17     precluded from seeking that as well.

18          **MR. LEVINE:**  Thank you, Your Honor.

19          **THE COURT:**  Right.

20          **MR. LEVINE:**  To be clear, Number 6 pertained to the

21     claims manual.  And I believe your order was with respect with

22     the index and table of contents for the claims manual.

23          **THE COURT:**  Okay.  Let me look.

24          **MR. LEVINE:**  Your Honor, is there any point of (audio

25     glitch)?

1          **MS. WANG:**  Well, may I be heard before we --

2          **THE COURT:**  Yes, of course.  Go ahead.

3          **MS. WANG:**  Thank you.  Yes, thank you.  On the

4    underwriting manual, there's -- first of all, it's not a

5    manual.  They're our guidelines.  I guess I have two (audio

6    glitch).  One, I don't think the underwriting guidelines are

7    relevant to whether Affiliated FM properly evaluated coverage

8    for Treasure Island's claim.

9          And they can't possible contain extrinsic evidence as

10   to intent either.  They're guidelines of what kind of risks

11   (audio glitch) is willing to accept under what kind of

12   circumstances.

13          So I don't even think they're relevant.  There's

14   authority -- there's dicta in Yamagata to that -- to that

15   effect.

16          Second, Mr. Levine mentioned wanting a custodial

17   witness to testify that there are no sections of guide -- of

18   the underwriting guidelines concerning contamination and

19   communicable disease.

20          And Mr. Bush has already appeared as a corporate

21   witness and testified to that.  So he's already done that.

22          Maybe he's forgotten.  But I don't think he's

23   entitled to a custodial witness, because we've already produced

24   custodial witness, a person most knowledgeable on underwriting.

25   And that was the testimony.

1          So there are no guidelines pertaining to the

2    provisions that are at issue in the case.  Even if there were,

3    I'm not sure it would be relevant.

4          And unlike the claims manual, it's my understanding

5    that there is not really an index *per se*.  I suppose,

6    theoretically, one could be created for this case.  But there

7    isn't an index *per se*.  So it's a little bit different from the

8    claim manual situation.

9          Thank you.

10         **THE COURT:**  Ms. Wang, first, let me just say that I

11   did not order a custodial witness.  I simply said Mr. Levine

12   could seek that.  I'm not making any order in that regard.

13         I don't know what Mr. Bush testified to.  And if he

14   has testified to what Mr. Levine ultimately seeks again, that

15   is entirely appropriate, first for a meet-and-confer, and then

16   for a Motion for Protective Order, if appropriate, if there

17   can't be an agreement.

18         So, you know, that's up to the parties.  I am not

19   ordering anything other than what is in before me; what is in

20   the motion --

21         **MS. WANG:**  Thank you.

22         **THE COURT:**  -- opposition.

23         As far as there being no index, I accept your

24   representation.  And, no, you do not have to create a document

25   for this file -- for this case, rather.  And that's not

49

1   appropriate.

2          And at this juncture, Mr. Levine, I am going to deny

3   Number -- I'm sorry -- Number 13 without prejudice.

4          If there is a time when there are addition -- there

5   is additional information that seems relevant and

6   proportional -- or I should say -- proportional and relevant --

7   of course, proportionality is the most important element for

8   the Court to consider -- the Court can reconsider that.

9          But at this juncture, you have had Mr. Bush testify

10  as the person most knowledgeable about the underwriting

11  process.  And it would seem to me, if there was some document,

12  manual, instruction, or guideline, he would have identified

13  that, presumably if asked.  And that you could then seek that

14  production.  But I haven't heard that at this time.

15         You can go back and review his deposition perhaps.

16  Perhaps there's something you don't recall.  I understand that.

17  There have been a lot of depositions recently apparently.

18         So Number 16 is denied without -- it was Number 16,

19  right?

20         **MR. LEVINE:**  Thirteen.

21         **THE COURT:**  Number 13.

22         **MS. WANG:**  Thirteen.

23         **THE COURT:**  Excuse me.  Number 13 is denied without

24  prejudice.

25         That takes us to -- the next in your motion are

1    Number 31 and 32.  I understand there is also a few others that

2    we -- that are grouped together, and we will get to.

3          But with respect to Number 31 and 32, Mr. Levine, I

4    am not going to order the production of information submitted

5    to State regulators other than Nevada, which I understand have

6    been produced, with respect to contamination or communicable

7    diseases at this time.  So those requests are denied without

8    prejudice.

9          If you want to make a record, I'm happy to listen.

10   But I will allow you, in the future -- this is not preclusive

11   of future requests.

12         **MR. LEVINE:**  Thank you, and I appreciate that, Your

13   Honor.  In light of the denial without prejudice, I don't think

14   that there is a need to make a record; certainly not an

15   extensive one, other than the points that I stated previously.

16         But with we do know that certain documents exist that

17   were distinguished from other states.  And it's curious, at a

18   minimum, that we really see where documents exist with respect

19   to the Nevada.

20         **THE COURT:**  Well, Nevada -- if you knew Nevada, it

21   wouldn't surprise you about the dearth of documents and records

22   of all sorts of things in this state.  We didn't even keep

23   legislative history until the relative recent past.

24         So we are an unusual state.  And I come from New

25   York, and I lived in California, and I practiced law in

51

1  California.  And I can tell you Nevada is unusual.

2       Number 30 is, "All documents concerning AFM's notice

3  or tender of any claim to any insurer or reinsurer."  And

4  Defendant says there are none.

5       But, Mr. Levine, I believe you have a basis for

6  thinking that's not entirely accurate?

7       **MR. LEVINE:**  We do, Your Honor.  And that comes

8  through the documents that we have obtained from other -- other

9  pre-filed dockets.  And also, I believe, testimony in this case

10  that there was a reinsurance for communicable disease coverage.

11       And I don't want to make a misrepresentation.  So

12  I'll even get the -- and not specifically reference the (audio

13  glitch) testimony with the documents that we have seen on other

14  public dockets.

15       But suffice to say, Your Honor, we will waive their

16  rights with insurance for what the communicable disease cover.

17       We know that the reinsurance that had been available

18  has since been, you know, lost or reduced.  As a consequences

19  it (audio glitch), and given the new existence of reinsurance,

20  again, it's very curious to hear that there were more claims or

21  (audio glitch) of reinsurers with respect to -- per the claims.

22       **THE COURT:**  Well, of course it would be as to this

23  COVID claim.  I don't know if it -- really, if there were COVID

24  claims in other states or other countries that would

25  necessarily be relevant.

52

1          But is -- Ms. Wang, just plainly stated, is there any

2   reinsurance that existed during the pendency of this claim

3   for -- that would cover communicable diseases?

4          **MS. WANG:**  Well, that's a different question than

5   what the request seeks, actually.

6          **THE COURT:**  It is.  I'm narrowing the -- well, the

7   request is, "All documents concerning AFM's notice or tender of

8   any claim to any reinsurer or insurer."

9          And I realize --

10          **MS. WANG:**  Right.

11          **THE COURT:**  -- that it's different than whether there

12   was any.  And you are drawing that distinction.

13          So there could have been, but no tender was made, or

14   no notice was made; is that the point that --

15          **MS. WANG:**  That is the point, yes.  And I would also

16   offer that the information that's cited in Treasure Island's

17   reply -- that was obtained from another matter apparently -- I

18   don't think supports their request.

19          You know, that statement, in a vacuum, to me, shows a

20   decrease in appetite for communicable disease coverage in the

21   reinsurance market.  Not that claims or notices or tenders are

22   being made by AFM, in particular, the Treasure Island case.

23          So I don't -- I think it's apples and oranges.  And,

24   you know, the testimony is that no notice or tender has been

25   made concerning the Treasure Island case.

1          THE COURT:  Okay.  And so --

2          MR. LEVINE:  Your Honor --

3          THE COURT:  -- they don't limit this to Treasure

4     Island of course.  And I understand that that is how you are

5     viewing this --

6          MS. WANG:  Well --

7          THE COURT:  -- as reasonably -- as a reasonable

8     request.  You are making that distinction.  And I understand

9     why.

10         So go ahead, Mr. Levine.  I'll let you --

11         MS. WANG:  If I may just correct that.  I do -- yeah.

12    Sorry.  I do make that distinction for purposes of the request

13    because I do think it's overly broad.

14         But the fact of the matter is, it's my understanding

15    no tender or notice has been made at all.

16         THE COURT:  On a COVID -- on a communicable disease

17    claim arising from COVID?

18         MS. WANG:  Correct.

19         THE COURT:  Okay.  Go ahead, Mr. Levine.

20         MR. LEVINE:  Thank you, Your Honor.  That, again, is

21    a curious representation.  Because (audio glitch) whether the

22    insurance company or other, has insurance or reinsurance.  Now,

23    you would expect that maybe you'd make a claim.

24         And understanding the representations that were made

25    in the other matter, as referenced in the reply brief, it's

1   very clear that the loss of the insurance is having a (audio

2   glitch) effect on AFM and its willingness to continue to offer

3   a certain coverage of (audio glitch).

4           So, again, very curious at a minimum, what the

5   insurance or reinsurance that wasn't (audio glitch).

6           And also, Your Honor, this -- it really isn't a point

7   beyond the requests.  The request is not really a (audio

8   glitch) a claim or tender regarding Treasure Island's claim

9   that -- any claim.

10          And, two, that it's not just a notice or tender

11  that's the subject of the request and, as Your Honor pointed

12  out, documents concerning a motion pending or a claim through

13  the insurer or reinsurer.

14          So it is a broad request; not unreasonable and not

15  all disproportional.  Particularly, might have -- the way

16  reinsurance works, one thing that we do not know is whether

17  this reinsurance was particular to the AFM policy, or whether

18  it was a (audio glitch) that had broader applications and

19  multiple (audio glitch) or multiple markets of insurance (audio

20  glitch) AFM (audio glitch) hotels, casinos, companies west of

21  the Mississippi.  It could be in the category of insurance.

22          So it's potentially misleading to characterize the

23  absence of a claim particular to Treasure Island's claim as

24  limiting -- it was including a potential claim or noticing

25  (audio glitch) reinsurer.

55

1          **THE COURT:**  Ms. Wang, just a quick question, because

2   I want to make sure I understood you correctly.

3          Setting aside whether there is a policy of

4   reinsurance, you have stated that there has been no submission

5   to reinsurance based on the communicable disease portion of

6   the -- or coverage in the policies arising from COVID-19.  Is

7   that correct?

8          **MS. WANG:**  Your Honor is correct.

9          **THE COURT:**  Okay.

10          **MS. WANG:**  It's my understanding that there is

11   reinsurance for all communicable disease.  The limits of course

12   of the communicable disease coverage are relatively low

13   compared to the (audio glitch) limits of policies.

14          Here, it's 100,000 for property damage and 100,000

15   for business interruption.

16          But no notices have been made.  And, you know, I

17   don't know -- Mr. Levine referenced the impact that --

18          **THE COURT:**  That's not relevant to this or pertinent

19   to this case.  I am not interested in that at this time.  You

20   know, world events impact insurance every day.  So I --

21          **MS. WANG:**  Thank you.

22          **THE COURT:**  I'm not really -- and world events do not

23   evidence bad faith.

24          I mean, insurance is an interesting -- insurance is

25   an interesting business.  My father loved it.  I know lots of

1  people who think it's, you know, just sort of a game.  You

2  know, I'm glad I have it when I need it.

3          So we'll leave it at that.  I've never been in

4  business for myself.  I've never had business insurance.  I'm

5  not expressing any opinion on that.

6          Mr. Levine, I don't believe that what motivates

7  business to insure or not insure a particular type of

8  occurrence is necessarily evidence of bad faith.  And I don't

9  find it proportional to the needs of the case at this time.

10  And I have no evidence to suggest that Ms. Wang is

11  misrepresenting a fact.

12          If there is additional evidence or if she discovers

13  something that is new or that she didn't understand -- which

14  happens from time to time in cases -- I will ask her to produce

15  what is responsive with respect to any tender or notice of --

16  to any insurer or reinsurer for coverage related to COVID-19

17  that arises in this policy for Treasure Island.

18          But other than that --

19          **MR. LEVINE:**  Judge, if I may?

20          **THE COURT:**  One second.

21          **MR. LEVINE:**  If asked --

22          **THE COURT:**  But other than that, I am not ordering

23  anything today.  And the denial is without prejudice.

24          Go ahead.  That's Number 30.

25          Go ahead.

57

1        **MR. LEVINE:**  Thank you.  And I just want to make sure

2  that the representation is clear in my mind and on the record.

3        Because the request is not limited to reinsurance or

4  the communicable disease coverage; although that certainly is

5  the point in the document referencing (audio glitch).  The

6  request is for the tender of any claim to insure or reinsure or

7  coverage related to COVID-19 and/or SARS-CoV-2.

8        And as the Court is well-aware, from (audio glitch)

9  at AFM's dispositive motion, the vast majority of this case

10 focuses on coverages that are not within the communicable

11 disease companies that Ms. Wang mentioned.

12        And I'd like to make sure that we are clear --

13        **THE COURT:**  If there is any --

14        **MR. LEVINE:**  -- that the --

15        **THE COURT:**  -- submission to an insurer or reinsurer

16 for insurance coverage to AFM to defend related to the COVID-19

17 or SARS-CoV-2 by Treasure Island in this case, that will be

18 produced.

19        Otherwise, the claim is denied -- Number 30 is denied

20 without prejudice to allow you to renew it should there be some

21 additional evidence that comes forth that demonstrates why the

22 broad nature of this claim is proportional and relevant to the

23 claims.

24        **MR. LEVINE:**  Thank you, Your Honor.

25        **THE COURT:**  Going to move on to Number 16.  And

1   Number 16 states, "All documents concerning any claim submitted

2   to AFM, from January 1, 2020 through the present, for which AFM

3   denied coverage in whole or in part based on the absence of

4   physical loss or damage."

5           Mr. Levine, that is an extraordinarily broad request.

6   It doesn't even limit it to denial of coverage for physical

7   loss pertaining to COVID-19 or SARS-V-2 -- it doesn't matter

8   what you want to call the virus.  And it doesn't limit it

9   geographically.

10          So I have no idea where a -- where Defendant insures

11  people.  But I sure as heck don't find -- or find, rather, that

12  claims for anything outside the United States are irrelevant.

13  And anything for physical loss or damage that does not arise

14  from COVID-19 is sufficiently attenuated that it will not be

15  ordered at this time.

16          If you're asking for AFM's denial of coverage based

17  on the absence of physical loss or damage for COVID-19 or SARS-

18  V-2 coverage for hotel casinos -- which you have not stated.

19  But if you are willing to limit it to that extent, for hotel

20  casino operations, then I might consider it.

21          But, otherwise, this is grossly overbroad.

22          **MR. LEVINE:**  Your Honor, point well taken.  There are

23  a number of ways that we can limit this.  And I would welcome

24  the opportunity to confer with Ms. Wang to narrow it on -- in

25  any number of ways.

1          **THE COURT:**  Okay.  Go ahead, Ms. Wang.

2          **MS. WANG:**  Thank you.  Yeah.  Again, I would

3     reiterate that we are this -- this request goes to Treasure

4     Island's claim of bad faith.  And the discovery is certainly

5     burdensome, even if it's narrowed considerably.  It would have

6     to narrowed considerably, obviously.

7          But I still think it's going to be disproportionate

8     to the probative value at this juncture.  There may come a

9     time, as Your Honor has aptly noted -- down the road where it

10    makes sense.  I don't think it makes sense right now.

11         I can tell you that just producing Treasure Island's

12    claim file was the subject of a lot of effort on our part and

13    AFM's part.  And we're still fighting over it.  Although, I

14    think Your Honor has resolved that today.

15         But the point being that, even if we could get the

16    universe down to a relatively narrow handful of files involving

17    COVID-19 in a hotel or casino in Nevada, for example -- that

18    was denied -- would still require review of -- we don't

19    automatically know which ones were denied.  So we'd have to

20    review, you know, a lighter universe of files.

21         And, you know, we estimated one hour per file, which

22    is very, very optimistic.  I think it would be more like

23    several hours per file, and that's not counting the time

24    required to redact names, look for privilege.  Both reviews

25    require, you know, maybe doubling the time, for example.

60

1          So our view is that, even if we could narrow to a

2    universe of a dozen claims, that would still implicate maybe

3    100 man hours.  And I don't think that's warranted because this

4    is bad-faith discovery.  And the likelihood is that that kind

5    will not survive, even if other parts of the claim do survive.

6          And in any event, certainly we can revisit this

7    request if that should happen.  Or if the claim does survive,

8    then we would certainly be willing to revisit the request at

9    that time.

10          But it's a lot of work, and we all have a lot of work

11    already going on in this case and, of course, other cases.  And

12    I just don't think it makes sense.

13          **MR. LEVINE:**  Your Honor, if I may respond?

14          **THE COURT:**  Go ahead.

15          **MR. LEVINE:**  I made this point at the outset; I'll

16    make it again.  Even if the Motion for Partial Judgment on the

17    pleading prevails, there still is a bad-faith claim in this

18    case.

19          It's not case dispositive, and it certainly is not

20    case dispositive of the statutory bad-faith claim as it relates

21    both to the main property damage and business interruption

22    claim, more specifically to the failure to investigate under

23    the communicable disease coverages.

24          So at a minimum, there absolutely is a present bad-

25    faith claim on fair claims practices claim in this case.  We

1    believe (audio glitch) and ultimately present it to a jury on

2    the questions of fact.  That's the first one.

3          Second -- and I've paid (audio glitch) to this (audio

4    glitch).  But there are many ways to narrow this discovery.

5    And, in fact, in many ways, there -- that it has been narrowed

6    in other cases.

7          This is a category of discovery that is now myself

8    and the others on this hearing.  And (audio glitch).  We know

9    how to narrow those requests in a way that both takes into

10   account the time necessary on the insurer's side and satisfies

11   the need to understand how our claims may be handled

12   consistently or inconsistently, which is the concern by

13   Treasure Island.

14         I think, here, there's even less of a burden than

15   ordinarily is the case.  And I am well-familiar with that,

16   having been to Ms. Wang's insurers over the decade on the

17   carrier side.  I understand the process.

18         And what we also understand here, through the

19   testimony of AFM's witnesses, is that claims for communicable

20   disease are designated with a code in their claim system -- in

21   the R&V system.

22         It is simply a function of pressing the button and

23   identifying claims for communicable disease to identify the

24   communicable disease claims.

25         We also know that any claims arising from COVID-19,

62

1   as opposed to other communicable diseases, have to be within a

2   time frame of roughly 20 -- January 1, 2020 through the

3   present -- more like around March or April of 2020 through the

4   present.  So we're not talking about a tentative long period of

5   time.

6          And then, putting those -- those facilitating factors

7   aside for the moment, as I said, we're very limited locally.

8   Ms. Wang (audio glitch) to narrow this to, say, for example,

9   hotel claims or the ten largest (audio glitch) value claims or

10  perhaps the ten most recent casino claims.

11         There are a number of ways that we can do this to

12  minimize, if not altogether eliminate, any appreciable burden

13  on AFM, yet still produce the information that I -- that

14  Treasure Island is seeking.

15         **MS. WANG:**  Your Honor, may I respond briefly to the

16  last points that Mr. Levine --

17         **THE COURT:**  Yes, briefly, please.

18         **MS. WANG:**  Thank you.  He pointed out that if -- even

19  if we are successful on our Motion for Judgment on the

20  pleadings, the communicable disease coverage will still be at

21  issue.

22         But that, I think, goes right to my point, which is,

23  if that were the case, then the universe of claiming files that

24  would be relevant will be completely different than -- than

25  what might be relevant today.

1          If the Court says there's no coverage under any

2     provision other than communicable disease, then any claim that

3     was denied for business inter -- under the business

4     interruption coverage would be irrelevant.  So I think that

5     that kind of makes the point.

6          As far as the fact that these files are coded for

7     communicable disease, that -- that doesn't really narrow the

8     field.  That just means we've got, you know, as of the time of

9     Mr. Cook's declaration, 2,000 claims.

10          I think that's higher now.  I think it may be more

11     like 2,400, which would have to be reviewed to determine

12     whether -- whether the insured tried to provide evidence to

13     bring the claim under the communicable disease coverage,

14     whether that evidence was deemed sufficient, whether the claim

15     was paid or denied, and whether they're seeking coverage under

16     the other business interruption coverages.

17          That's a lot of review for a very minimal value,

18     which can certainly be done at a later date.  I mean, there's

19     no reason that -- that it needs to be done now.

20          And if it is done now, then that is going to impact

21     our schedule, because this is going to be a very big project.

22     Even, like I said, if it's a narrow -- narrowly tailored, I

23     think it could very significantly impact our schedule.

24          **THE COURT:**  The Court is --

25          **MR. LEVINE:**  Your Honor --

1          **THE COURT:**  No.  I'm done listening on Number 16.

2    Thank you.

3          Number 16:  The Court is going to -- the Court is

4    ordering Defendant to identify, not hotels and casinos, but

5    unique to Nevada, hotel casinos like Treasure Island, right,

6    all MGM properties, Caesars properties, Coast properties, Boyd

7    properties, right?

8          These are hotel casino operations; not a stand-alone

9    Hampton Inn or Quality Inn or whatever it is, right?  Not

10    those, right?  Hotel casinos in Nevada.  So I'm looking at the

11    State of Nevada only for the period 1-1-20 to the present.

12          And that means today, right, that have been denied

13    because of -- based on COVID-19 or SARS -- I never call it this

14    other thing -- SARS-CoV-2.  They're the same thing -- so under

15    the contamination or communicable disease provision.

16          That's all.  I just want to know -- I just want you

17    to provide to Plaintiff those that have been denied.

18          If it's ten, it's ten.  If it's 12, it's 12.

19          **MS. WANG:**  Your Honor, if I may clarify.

20          A moment ago, you said "identify".  So, are we

21    looking at providing a list of insureds who have, you know, a

22    Nevada hotel/casino combination, who have made a claim for

23    COVID-19 that was denied?

24          **THE COURT:**  That's correct.  That's it.  At this

25    time, that's it.

1        **MR. LEVINE:**  Thank you, Your Honor.  And to just

2   further clarify mutually that -- and for the record, Your Honor

3   mentioned the communicable disease coverage.  I want to make

4   sure the denial is with respect to --

5        **THE COURT:**  Well, it's because -- if it's denied

6   under communicable disease, it also has to be related to COVID-

7   19.  I'm not looking for Legionnaire's or anything else, right?

8   We're just talking COVID here.

9        **MR. LEVINE:**  Okay.  I totally understand, Your Honor.

10  The clarification with respect to the other coverages, the

11  business interruption coverage, the physical loss damage

12  coverages, I want to make sure that (indisc.) denies under

13  those coverages as well.

14       **THE COURT:**  If the claim has been denied because of

15  COVID-19 under the policy, property policy such as policy here

16  to a hotel/casino operating in Nevada from January 1, '20, to

17  today's date, February 25th, 2021, because of COVID-19, then

18  that goes on the list.  That's it.  Just the list.

19       **MR. LEVINE:**  Thank you, Your Honor.

20       **THE COURT:**  So, Number 16 is granted in part and

21  denied in part.

22       Then we get to Number 26, 27, they were grouped

23  together; 26 requested all documents concerning claims for

24  coverage under property insurance related to COVID-19 and

25  SARS-CoV-2.  This is denied without prejudice.

66

1          What you are getting will be the scope of what you

2     are -- what you are going to get under Number 16, Mr. Levine,

3     what Plaintiffs will get under 16 is the scope of what I'm

4     allowing to be produced at this time under Request Number 26.

5          That is an extremely broad request.  This one does

6     not have any timeframe, doesn't have a geographic scope, and it

7     is grossly overbroad.

8          And I would say if you intended something to be less

9     broad, ask a less broad question; 27 is denied, and 28 is

10    denied.

11         I note that I read NRS 679B.8741R.  I do not find

12    that exception to apply to this case.  This is not under

13    federal, state, local laws.  A request for production is not

14    what that section is reasonably referring to.  So, those three

15    requests are denied as grossly overbroad and vague.

16         And then we get to -- so that was -- I'm sorry; 26,

17    27, 28; I believe 29 is the same.  So, all of those are denied

18    as stated.  And 18, which is -- I have to go back.  I'm not

19    sure why 18 came after those, but I don't -- let's see.  court

20    filings.  That is also denied.

21         Mr. Levine, you can hire companies if you wish to

22    search court records for filings by other companies against

23    this defendant, or other insurers because those outcomes may

24    have some information for you that would be useful, but I am

25    not going to require defendant to produce a list or otherwise

1   of all court filings of claims made against them from January

2   15th through the present addressing the meaning of provision

3   policies -- of the provision policy form.  That's overbroad.

4              **MS. WANG:**  Your Honor, may I --

5              **THE COURT:**  Yes.

6              **MS. WANG:**  -- may I seek a little clarification on

7   the list that we're talking about.  So, Number 16.

8              **THE COURT:**  Yes.

9              **MS. WANG:**  I'm just concerned that if I provide a

10  list of insureds, that that could violate, for example, you

11  gave the example of I think maybe MGM brand or something like

12  that.

13             If that were an insured who had a claim that was

14  denied, I think that could violate their right of privacy under

15  that statute.

16             **THE COURT:**  The statute allows you to provide notice

17  to those entities; is that right, Ms. Wang?

18             **MS. WANG:**  I believe that's correct.  So --

19             **THE COURT:**  Yeah.  So, here's what I would say.  List

20  the entities; redact the name of the insured for now.

21             I realize, Mr. Levine, that limits your ability to

22  use the information, but you can also -- Mr. Anthony certainly

23  knows the presidents and GMs and other operators in Las Vegas,

24  presumably in Reno, and anything in Winnemucca, nobody cares

25  about.

1          So, I -- you know, he can reach out if he chooses.

2    And if you are -- if you get no headway, and you want to

3    consider whether notice and an opportunity for the other

4    insureds to grant or deny defendant's ability to disclose the

5    information, we can discuss that, but I would suggest first

6    that you find out if there are any such claims in Nevada

7    insured by this insurer that have been denied because of

8    COVID-19.  And if there are, then Mr. Anthony might make some

9    of his own inquiries before we burden the defendant with notice

10   requirements.

11          I've just lived in this town for a long time, and I

12   respect Mr. Anthony's position, and I think he's well known and

13   respected in the community.  And others might be willing to

14   cooperate in a certain respect with him, but if that doesn't

15   end up to be true, and that's not an order; that's just a

16   supposition by the Court, then we can revisit the issue.

17          That is the conclusion of ECF Number 40.  ECF Number

18   73, which is a single request.  That's the second request to

19   compel filed by Treasure Island seeks, in Number 58, all

20   documents concerning the origin of the language in a report

21   that was submitted by an expert for defendant.

22          I found this, The word "origin", vague and overbroad,

23   and not proportional to the needs of the case.  I'm not even

24   sure what you're seeking, Mr. Levine.  I'm happy to listen to

25   you, but I am concerned about the breadth of this request.

1    **MR. LEVINE:**  Your Honor, I don't think this request

2    is that broad.  It's not a provision in the policy, and the

3    request goes to exactly as Your Honor stated.  You know, how it

4    came to be, the drafting and the origin and revision that AFM

5    has made to it.  What we're trying to understand is what the

6    intended purpose and function of this provision is.

7         And the reason, Judge, we bring this motion is that

8    we've identified in public dockets, instances where AFM and its

9    companion companies, in this instance, FM Global, used the

10   exact same language many years ago in a post-911 case, in a

11   climate in a (indisc.) that is frankly at odds directly with

12   the way it is being applied in this case.

13        And it causes, you know, it puts the language in

14   question.  And it puts at issue the intended meaning and

15   application of that language by defendant, by AFM.

16        **THE COURT:**  Have you deposed the expert?

17        **MR. LEVINE:**  We have.

18        **THE COURT:**  You have.  And did you ask the -- you

19   don't have to answer this, but it would seem to me that you

20   would ask the expert why the provision is being applied

21   differently here than in 911.

22        Of course, 911 was a different set of circumstances

23   that physically -- I mean, obviously, impacted buildings.

24   Having lived in Manhattan, grown up there my whole life, and

25   remember when the Twin Towers were built, and everybody thought

1   it was going to tip the island over, and everybody hated them.

2   Now, everybody loves them.

3         So, I always sort of loved them, but that's neither

4   here nor there.

5         So, in any event, I think the word "origin" is of

6   concern to me.  If this is in the policy, on the loss payable,

7   it seems to me that perhaps when you get the claims manual

8   index and table of contents, you will be able to find

9   provisions in there that may discuss how this provision is

10   interpreted or applied.  I don't know.

11         And at this juncture, I just -- it seems, Mr. Levine,

12   to me that this is the kind of question that I would ask a

13   witness because I don't know how long this provision has been

14   in place.  You know, maybe it's been in place -- well, it's

15   clearly been in place at least 30 years.  So, or close to 30

16   years; so, 25 years, whatever it is.

17         So, they're going to go back and find the origin of

18   this?  I just -- I don't think is proportional to the needs of

19   the case at this time.  911 was 2001.  It was clearly in place

20   before that.  This is 2021, so I said 30 years; maybe I'm

21   exaggerating, but I have no idea.  At least 20 years though.

22         And how they would even discover the origin, or as we

23   say in New York, origin (pronouncing).  What -- how they would

24   do that.

25               **MR. LEVINE:**  Well, Judge, and I appreciate your New

71

1  York heritage.  (Indisc.) myself.

2          And I've done work on 911 business interruption

3  claims for about 10 years, so I'm very familiar with how

4  similar they are to what we're doing here.

5          And this is language used by AFM now.  It's language

6  that was used by Factory Mutual, by FM Global then, and if

7  anybody is going to have information about the original

8  document intent of that language, it's going to be the

9  defendant in this case, and through its associated companies.

10          The request is certainly provisional.  You know,

11  talking about a disparity in application of this language

12  that's resulting in a -- roughly 80 percent reduction in the

13  value of Treasure Island's claim.  This is a $40 million case.

14          **THE COURT:**  I understand.

15          **MR. LEVINE:**  So, this is a very substantial issue,

16  and it has a very substantial impact on the ultimate valuation

17  of the claim.

18          So, from a proportionality standpoint, Your Honor, we

19  respectfully submit that there is a lot at stake that weighs

20  against any burden that AFM will have in looking in its own

21  files to determine the original drafting of this policy

22  provision.  Yes, it should be in their files.  I don't believe

23  an extensive search is going to be necessary to go back to the

24  original draft.

25          **THE COURT:**  How would you propose they search for

1   this?  Because I don't even know how they would search for the

2   origin of something that's 20 years old.  I mean, computers

3   weren't the same then than they are now.  There are so many --

4   and even if they have scanned documents, you know, I don't know

5   what they have that would really go to the "origin", which is

6   the word that you used.

7          And I -- I understand the value of this claim, which

8   is why I did not deny -- why I denied the stay of discovery.

9   And I understand the concerns.  And I understand the importance

10  to Treasure Island, but I also have a duty to measure that

11  against how defendant would search for this.  How -- that's the

12  proportionality.  That -- it's not the value of the claim, but

13  how they would even go about doing this is what concerns me.

14         **MR. LEVINE:**  And Your Honor, I think the explanation

15  is easy.  And I'm sure Ms. Wang will have a different

16  perspective on this, but again, from my own experience, these

17  vitals, these documents are not, you know, dumped into a bin --

18  in an unorganized bin.  The policies are categorized, they are

19  archived, they are readily available at the company and --

20         **THE COURT:**  But how would a policy that's 22 years

21  old, or 21 years old, tell you the origin of what's in that

22  policy?  So, even if they could find the 911 applicable policy,

23  how would it tell you what the origin is?  That wouldn't.

24         **MR. LEVINE:**  Well, you don't know that, Judge, and

25  that's why we're asking for it in discovery.  It may be one of

1  two things.  It may be that it's a very easy find, and they can

2  quickly say, here is the entire history on this provision.

3        On the other hand, they may say, we don't have it

4  anymore.  But we don't know the answer to that, and I believe

5  Treasure Island is entitled to have a reasonable search

6  conducted to determine what the insurance company means.

7        And we shouldn't be cutting a loss in a case even I

8  can articulate how the company reviews its files, and frankly,

9  I don't think Ms. Wang knows, as she sits here today, but we'll

10  find out in a moment.  At a minimum, the company should be

11  asked to tell us what do they have, how do they have the

12  information.

13        And as Ms. Wang has already done in this case, she

14  can put forth that provision identifying the number of hours

15  and the process it would take to determine this sort of

16  information.  I think at a minimum we are entitled to that.

17        **MS. WANG:**  If I may respond.

18        **THE COURT:**  Yes, please.

19        **MS. WANG:**  Now, I think that the point is that the

20  provision that's at issue has been in the -- in Treasure

21  Island's policy for a long time.  And, you know, why it came

22  about or how it came about, I'm not sure how that's relevant to

23  how AFM is applying the provision or might apply the provision

24  to Treasure Island's claim.

25        And that brings me to my next point which is, again,

1   even if it were relevant and proportional, which I don't

2   believe that it is, it's premature at this time because there

3   is no -- coverage hasn't been determined under any portion of

4   the policy.

5           And so, no loss has been measured, and that provision

6   has not even been applied.  And it's true, our expert used it

7   in a theoretical calculation assuming coverage, but that -- it

8   hasn't actually been applied.

9           And it's sort of unlikely that it will be applied,

10  you know, in our view because assuming coverage is established

11  under the communicable disease provision, it would only be

12  applied if the business interruption losses were under the

13  limit of $100,000, which I have to say seems unlikely.  Maybe

14  I'm going to shoot myself -- that's shooting myself in the

15  foot, but I think that's unlikely.

16          So, it's talking about -- I mean, the information,

17  even if it existed and could be found, would only be relevant

18  if all of those hurdles were overcome.  And I think it's

19  unlikely that that's going to happen.

20          And so, for that reason as well, this information is

21  disproportionate at this time.

22          **THE COURT:**  Mr. Levine, do you wish to say anything

23  further?

24          **MR. LEVINE:**  Your Honor, as I said, and I've said a

25  number of times already, but there is a present claim under

1  this policy that has been mishandled.  It has been (indisc.)

2  investigated.  There has been virtually no investigation, and

3  that is the claim under 686A (indisc.).

4       At a minimum, this provision goes to the mishandling

5  and mis-valuation of the claim there.  However, and even much

6  farther than that, and again, Ms. Wang and I respectfully

7  disagree about the outcome of their dispositive motion.

8       And at a minimum, the valuation of that gravity, the

9  business interruption claim, is central.  It has been applied

10  and addressed by an expert who testified almost eight hours

11  yesterday about it.  And it is the subject of discovery, and

12  it's the subject of, not only the (indisc.) claim, but the

13  statutory claim and the valuation claim under the breach of

14  contract.

15       The company has clearly applied this language in two

16  very different ways.  The expert testified, we heard him

17  yesterday, that he was applying it one way (indisc.).  We have

18  a motion for summary judgment and opinion stated post-911 where

19  it was applied in a completely different manner because it

20  benefitted the company then to do it differently.

21       The language is unclear.  Your Honor can see that on

22  its face.  What it means, I can't tell you as I sit here today.

23  And that's why we need to know what the company intended when

24  it drafted it, what the company intended when they put it in

25  this policy, and what the company perhaps represented to others

1   in the State of Nevada or elsewhere about how this provision is

2   supposed to apply.

3          It hasn't been identified as admission until today

4   because it hasn't been adhering to this policy that required

5   its application until today.  So, to Ms. Wang's point, the fact

6   that it's been in the policy for, say, 10 years, is irrelevant.

7          **THE COURT:**  I am denying the second request for

8   production -- excuse me.  Second motion to compel without

9   prejudice.

10          At this juncture, this request is vague, and because

11   it is so substantially vague, it is grossly overbroad and

12   unduly burdensome.  And those are old concepts, but I find the

13   language "origin", given how old this is, unclear and

14   impossible at this juncture to determine its relevance or

15   proportionality to the case.

16          So, ECF Number 73 is denied without prejudice.

17          That takes me -- and I have just a few minutes

18   because I have a meeting with the Chief Judge in 17 minutes.

19   Are the issues in what was ECF Number 58, defendant's motion

20   for protective order and temporary stay of examinations, is

21   that resolved, Ms. Wang?

22          **MS. WANG:**  I'd say it's moot.

23          **THE COURT:**  Right.  Okay.  So, that's what I

24   presumed.  The Court never ruled on it exactly, but ECF

25   Number 58 is denied as moot.

77

1          And then we are at ECF Number 77, which is a

2     stipulation pending this hearing.  And it appears that you are

3     seeking an extension of discovery.  Is that correct,

4     Mr. Levine and Ms. Wang?

5          **MR. LEVINE:**  Yes, Your Honor, it is.  However, it

6     might have been (indisc.) valuation from the Court's ruling

7     today.  I can't say that the dates are necessarily --

8          **THE COURT:**  Right.  So, what I'm going to suggest is

9     that you meet and confer.

10          The Court is granting in principle an extension of

11     discovery, and if you would all just present a stipulation, or

12     if you have alternative views on how that should go, you can

13     present it in a single stipulation, and I'll probably hold a

14     brief hearing, hopefully much shorter than this one.

15          The transcript of this proceeding is the order of the

16     Court.  I believe I've been clear on each request for

17     production.  Is there any question I can quickly answer before

18     we adjourn?  Mr. Levine.

19          **MR. LEVINE:**  Your Honor, I have none.  I will defer,

20     with Your Honor's indulgence, to Mr. Cunio and Ms. Dennis to

21     make sure they don't likewise have any questions.

22          **THE COURT:**  Mr. Cunio.

23          **MR. CUNIO:**  No questions.  Mr. Cunio.  Thank you.

24          **THE COURT:**  Okay.

25          **MS. DENNIS:**  I have no questions, Your Honor.  Thank

78

1  you.

2          **THE COURT:**  Thank you, Ms. Dennis.  Ms. Wang.

3          **MS. WANG:**  I don't have any questions, and would

4  likewise ask for my team whether anybody has any questions,

5  other than can we get a copy of the transcript or will that

6  become an ECF document?

7          **THE COURT:**  You simply order it through the -- do

8  they do that, Ms. Garcia, through the same ECF system, or do

9  they call the Clerk?

10          **THE CLERK:**  They can get on the website and there

11  is --

12          **THE COURT:**  Okay.  On our website, there is a way to

13  order the transcript of these proceedings.  And it's usually

14  prepared very quickly.

15          **MS. WANG:**  Okay.

16          **THE COURT:**  So, does anybody on Ms. Wang's team have

17  any questions for me?

18          **MS. SPEAKER:**  No, Your Honor.  Thank you.

19          **MR. SPEAKER:**  No, Your Honor.  Thank you.

20          **THE COURT:**  Okay.

21          **MR. SPEAKER:**  Thank you, Your Honor.

22          **THE COURT:**  Thank you, everyone.  We are adjourned.

23          **MS. WANG:**  Thank you.

24      **(This proceeding was adjourned at 1:16 p.m.)**

25

## CERTIFICATION

DISCLAIMER:  The integrity of Mr. Levine's comments may be

    adversely affected due to muffled audio transmission.


        I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.



_____              March 3, 2021

        Signed                            Dated


           *TONI HUDSON, TRANSCRIBER*